THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* VINCENT MUMMIANI, Appellant.

(Argued November 30, 1931; decided February 9, 1932.)

*Michael F. Pinto, Samuel Backlar* and *John A. Mullen* for appellant. The confessions should not have been admitted into evidence. (*People* v. *Trybus*, 219 N. Y. 18; *People* v. *Barbato*, 254 N. Y. 170; *People* v. *Weiner*, 248 N. Y. 118.)

*Thomas C. T. Crain, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The question whether a confession is voluntary is one of fact for the jurors to decide. (*People* v. *Barbato*, 254 N. Y. 170; *People* v. *Lytton*, 257 N. Y. 310.)

LEHMAN, J. On September 9, 1930, Dominick Buoncore was shot in a restaurant in the borough of Manhattan, city of New York. His assailant escaped. Before his death Buoncore made a statement which was admitted in evidence as his dying declaration. The police officers, who wrote out the statement for the dying man to authenticate by his mark, understood him to say that he had been shot by " Moriano." He added, " See Patsy Cherry." It is quite possible that the dying man may have mumbled the name and that he may have said " Mummiani " when he was understood to say

" Moriano." At any rate it is Mummiani who has been convicted of the crime.

He was arrested on the evening of February 9th, 1931. He was taken to the police station. He was detained there for thirty-six hours, in defiance of a statute, before he was arraigned in court. By section 165 of the Code of Criminal Procedure " the defendant must in all cases be taken before the magistrate without unnecessary delay." This was a plain wrong for which some one should be punished. Disregard of the duty of arraignment does not avail, however, without more to invalidate an intermediate confession. (*People* v. *Trybus*, 219 N. Y. 18; *People* v. *Doran*, 246 N. Y. 409.) It is only a circumstance to be weighed with others in determining whether a confession has any testimonial value.

The defendant, during his unlawful detention, was questioned by police officers. He denied guilt. Five police officers were present at his questioning. They testify that he was not beaten but that, at about eleven o'clock in the morning after his arrest, he stated that he would tell the truth if they would give him some food. They gave him the coffee for which he asked. Then, in the presence of a stenographer, he made a detailed confession that he had committed the crime. He repeated that confession with some unimportant variations before an Assistant District Attorney the same afternoon. At the trial he testified that before he made the confession of guilt he was brutally beaten by the police officers and that the confession was made under the influence of fear, produced by threats to continue the beating until he confessed. He says that the words of the confession were put into his mouth by the police officers. It is upon that confession that the conviction of the defendant rests.

No witness gave any testimony which tends, independently of the confession, to show that this defendant is in fact the guilty man whom the decedent intended to

identify when he was understood to say that he was shot by " Moriano. See Patsy Cherry." Patsy Cherry was identified at the trial as one Patsy Cerosuolo. He had been sitting with the decedent at the restaurant a short time before the shooting. He was acquainted with both the defendant and the decedent. He was in or just outside the restaurant at the time of the shooting. It was said in the opening address of the prosecuting attorney that he would testify as to the circumstances. Perhaps he could throw some light on the crime. He was, we are told, in court. He was not produced as a witness.

Nevertheless it cannot be said that the conviction of the defendant is against the weight of evidence if the confessions be thrown into the scales against the defendant. The confessions contain within themselves some indications of their truth. A narrative so circumstantial cannot easily be reconciled with the defendant's present story that it was an utter fabrication. A multitude of extrinsic circumstances not sufficient of themselves to establish the defendant's guilt bring the confessions into accord with probability. The real question in this case is whether the confessions were obtained by means forbidden by the law which so pulverize their testimonial value that coherences internal or extrinsic would thereafter count for nothing.

A confession by a defendant can be given in evidence against him unless made under the influence of fear produced by threats or unless made upon a stipulation of the district attorney that he shall not be prosecuted therefor. (Code Crim. Pro. § 395; cf. 2 Wigmore on Evidence, §§ 823, 831, and cases there cited.) Other forms of pressure, not amounting to a threat, may be considered by the jurors in determining whether the confession is true or false. They do not impose a duty on the jurors to throw the confession out if they find it to be true. Whatever the rule may be in other jurisdictions (*Bram* v. *United States*, 168 U. S. 532), our law does not require that

a confession to be admissible shall be a spontaneous utterance made by a defendant to relieve his conscience. Only where the confession is made under the influence of fear produced by threats is it inadmissible. Then it loses all testimonial value, for so the statute has ordained.

Our study of the record leaves us with a grave fear that the confessions were obtained in violation of the statute, by brutality and threats. True, if the testimony of the prosecution might reasonably be accepted by the appointed triers of the fact, we may not because of our fears substitute our judgment for theirs. We do not say that the jury could not, upon this record, reasonably credit the denial by the police that they had not beaten the defendant to obtain his confession rather than the assertion of the defendant that he was beaten. Nevertheless, the question remains whether there has been a fair trial of this issue at which the prosecution has presented testimony which would enable the triers of the fact to determine that issue fairly and truly.

Since that is the ultimate question presented upon this appeal, there is no need to analyze the testimony pro and con to determine its weight. Enough to point out that there is a basis for our grave fears and that the issue has not been presented to the jury in a manner which might allay those fears. Where a defendant has given a detailed confession, he knows that he can escape its effect only by testimony, true or false, that it was extorted from him through fear induced by threats. Only a false sentimentality would lead to giving greater weight to his highly interested assertion than to the denial of the police officers who have no interest except to see that crime is prevented or the wrongdoer punished. On the other hand, no false sentimentality towards the police, however brave and zealous they may be, should lead us to condone disregard of the law by its sworn protectors or to give testimonial value to a confession which under the law has no such worth.

Here though the assertion of the defendant that he was beaten is met by denial of the police officers who are accused of the brutality and threats, they do not deny that they held the defendant unlawfully without arraignment for thirty-six hours until they had obtained his confession. They admit that while they unlawfully held the defendant in the police station, one of them gave the defendant a clean shirt in place of one which the defendant claims was made bloody by alleged beating and a blow on the nose. They admit that if this gift was made in a spirit of charity, the same spirit did not induce them to furnish the defendant with any food until he promised to give a statement, " if you get me some food." They content themselves with a bare denial of violence, giving no details or explanation of why they held him unlawfully or what occurred before he gave the confession or what induced a change by the defendant from stout assertion of innocence to confessions of guilt, nor do they explain why the presence of five police officers was required to induce a " voluntary " confession.

The growing number of instances in which officers of the police force stand accused at our bar of threats and brutality in the extortion of confessions is a cause of deep concern to all the judges of the court. We feel it a solemn duty, irrespective of the outcome of this cause, to remind the officers of the law that the suspicion now attaching to them has been fostered by their own conduct, at times by abuse of power, not amounting in itself to violence or coercion, but furnishing the soil out of which violence and coercion spring, at times by sheer indifference, a cynical refusal to inquire where relentless pressure of the probe would be likely to reveal too much.

The police are guilty of oppression and neglect of duty when they willfully detain a prisoner without arraigning him before a magistrate within a reasonable time. (Code Crim. Pro. § 165.) The conclusion is inescapable that they do this for the purpose of subjecting him to an

inquisition impossible thereafter. Until arraignment before a magistrate, he is held *incommunicado*, without the protection that comes from the advice of counsel or the encouragement derived from the presence of family or friends. After arraignment, he has these and other helps to fortitude. In a vast majority of the cases that have come before this court with a defense that a confession was illegally extorted, perhaps, indeed, in all, the wrong, if there was any, was done before the prisoner was brought to court, and would probably have been prevented if he had been brought there without delay. (Cf. Lawlessness in Law Enforcement, vol. IV of the Reports of the National Commission on Law Observance and Enforcement, June, 1931.)

The willful violation by the police of the statute which calls for prompt arraignment is a crime. (Penal Law, § 1841.) An officer who holds a prisoner in custody instead of taking him to the nearest magistrate without unreasonable delay should be disciplined by his superiors, and prosecuted by the District Attorney like any other malefactor. A District Attorney who willfully neglects to initiate such a prosecution after knowledge of the offense may be guilty of a crime himself.

Indifference has been an effective ally of intimidation and oppression. Prisoners who have confessed to the police are commonly brought before the District Attorney, or an assistant, to whom the confession is renewed. Very often the examiner makes no inquiry whatever as to the use of threats or violence. At other times there is a perfunctory question followed by a perfunctory denial. A prosecuting officer, inspired by a genuine desire to put an end to these abuses, will press inquiry further. He will see to it, in every case of a police confession, that the prisoner is questioned, searchingly and earnestly, as to everything said and done by the police from the moment of the arrest. He will give assurance to any prisoner who charges the inquisitors with brutality or coercion

that the full power of the prosecuting officer will be exerted to protect the accuser from retaliation and a repetition of the wrong.

We are told that here the defendant's story is improbable because he did not complain to prison physician, District Attorney or magistrate that he had been beaten. That is a circumstance to be considered by the jury, but it is certainly not conclusive. The prison physician testified that though no such complaint was made, his records show that the defendant did ask for zinc salve which is commonly used " for any abrasion or contusion." Then, too, it is not without significance that the prison physician also testified that the defendant is of an emotional type that gives in to pain and suffering and might talk or do things in order to avoid physical pain. Moreover, according to the defendant's testimony, even when he was on the way to the District Attorney's office the police officers continued their threats.

We refrain from pointing out possible answer to other contentions that the defendant's story is improbable. To do so might lead to the implication that we believe that in this case the jury could not reasonably refuse credence to the defendant's story; though, as we have said, upon this record the jury might reasonably credit the denial of the police that they made use of the opportunity afforded by the defendant's unlawful detention, to compel an incriminating statement by threats and violence.

In *People* v. *Weiner* (248 N. Y. 118) and *People* v. *Barbato* (254 N. Y. 170) the evidence of beating was so conclusive that we were constrained to hold that the only reasonable inference was that the police officers' denial of a beating was untrue. Here the evidence is not so conclusive, yet it does leave inescapable doubts as to whether the confession has not been extorted by fear induced by threats. These doubts are not the result solely of the assertion of the accused but rather of the admitted illegal detention of the accused without arraignment and without

food, till by some means, lawful or otherwise, the confession was obtained; it is the result of failure even to offer any testimony of what transpired when five officers were trying to obtain a confession, except the bare denial that there had been any beating; it is the result of the vague and in some respects contradictory testimony offered by the People in regard to the unusual circumstance that a police officer charitably furnished the defendant with a clean shirt of his own though no police officer offered him even a cup of coffee till he had promised to make a statement.

We are confronted with the problem of whether the courts must accept helplessly the bare denial of police officers of the accusation of brutality extorting a confession of crime of which the accused may or may not be guilty without even requiring a full explanation of their conduct — though their conduct itself creates grave doubts which mere denial of violence does not allay. To admit impotency under such circumstances is to admit that police officers, prosecuting attorney and courts are hopelessly enmeshed in a vicious system commonly called the lawless enforcement of the law. The jury must fairly pass upon the evidence presented to it — however incomplete and unsatisfactory that evidence may be. The prosecuting attorneys rest under the duty to present the evidence in manner that will adequately disclose the truth; the courts rest under the duty to compel the production of such evidence when available. Otherwise there can be no adequate protection of the rights of the individual and of the State. We do not say that when the police officers here have given fuller testimony of what transpired in the police station before the confession was made and why the defendant was unlawfully detained that all doubts will be removed. That we cannot know in advance. We do not say that even if grave doubts still remain, the jury will be compelled to reject the confessions. We do not even say that upon this record, if we were triers of the fact, we should hold that the police officers were guilty of the

wrong which they deny. We do say that this accused is entitled to a trial at which the jury will not be put in the dilemma of either accepting the bare denial of violence by the police officers or of branding them as false witnesses and allowing a possibly guilty murderer to escape the penalty of his crime. There can be a fair trial of a criminal charge only where there is no evasion of the issue.

There is a well-justified and general dissatisfaction that punishment for crime is too uncertain to act as an effective deterrent to crime. The courts have the responsibility of so guiding the conduct of a trial that so far as possible its outcome will be the inevitable conviction of the guilty or the acquittal of the innocent. Error at the trial is at times inevitable — that may be disregarded if it does not affect the result. Doubt must at times remain, for conviction rests upon probability, not absolute certainty. None the less error becomes less frequent and doubt less disquieting if the courts insist that trials must be so conducted that guilt or innocence is proven by competent evidence and that all evidence which may enable the jury to discern the truth is laid before it. The interests of society are badly served when a wrongdoer is allowed to escape punishment because of technicality or outworn formula of the law or doctrinaire principle out of harmony with reality; but the interests of society include the protection of the right of an accused to immunity from violence and to a fair trial where the truth is properly shown. When the judgment is of death, this court has the power and the duty to order a new trial not only " if it be satisfied that the verdict was against the weight of evidence or against law," but also if it be satisfied " that justice requires a new trial." (Code Crim. Pro., § 528.) Doubt whether this defendant has been properly convicted dictates that, in his interest and in the interest of society alike, there shall be a new trial where there can be a more adequate search for the truth.

The judgment of conviction should be reversed and a new trial ordered.

CRANE, J. The defendant, Vincent Mummiani, has been convicted of murder in the first degree for the killing of Dominick Buoncore, on the 9th day of September, 1930, in a cafe at 2287 First avenue, Manhattan, in the city of New York. The appeal is directly to this court, where, by the mandate of the Constitution (Art. VI, § 7), we must review the facts as well as the law, to see if there be any reasonable doubt of the defendant's guilt.

The defendant was arrested in Brooklyn, February 9, five months after the shooting, and was taken to police headquarters, where the next day he made a written confession, first, to the police officers, and later in the day, to the District Attorney. The finding of Buoncore's body, pierced with bullet holes, is sufficient corroboration of the confessions to meet the requirements of section 395 of the Code of Criminal Procedure, as matter of law. Whether, however, all the evidence, taken together, removes all reasonable doubt of the defendant's guilt, remains to be considered. Outside of the confession, there is little or no evidence to prove that the defendant committed the murder.

The confessions in themselves have all the indications and appearance of being truthful. The defendant says, however, that they were procured from him through fear produced by threats, and force used by the policemen; that the whole story is of their manufacture; that the details were framed by them. This I do not believe for the following reasons: The defendant does not deny giving the answers as contained in the confessions. His lengthy answers could not have been mere repetition of a story prepared by the police, which he had committed to memory. The following may be taken from his statement as illustrations sustaining this conclusion:

" Q. Just tell us everything he did which caused you to shoot him?   A. He laid the girl (Marie). When I saw Marie on Sunday, September 7th, she told me that Dominick Buoncore wanted to take her out and he made

a date with her, and then she told me that he had her
up in a room on 118th St. between 1st and 2nd Aves.,
I think it is 312 East 118th St., and that he laid her.
She said Dominick took her there on Saturday, the day
before.

" Q. What else did she tell you?   A. She said I was no
good to her and that I cannot go out with her, that
she wanted someone else to take care of her; she said I was
not fit enough to hold a girl and for that reason she left
me on September 7th, 1930.

" Q. What happened after September 7th, 1930?
A. I just was sore because he laid the girl and I gave him
the works.

" Q. When did you next see Dominick Buoncore after
you saw the girl that Sunday?   A. I didn't see him on
that Monday; I was going to give him the works that
Monday but I could not find him.   They told me in the
cafe that he went to a funeral.

" Q. What did you do after that?   A. I hid the gun
on a window in the rear of a tenement house on 117th
Street between 1st and 2nd Aves, next to Borden's stable.
As you go up one flight of stairs the window leads to the
alley downstairs and I left the gun on a window sill a
little after 2 P. M. on that Monday; the house I went into
was the first one east of Borden's on the north side of
117th Street between 1st and 2nd Aves.

" Q. When did you first go back to the house in 117th
St. and get the gun in the morning?   A. About 10 A. M.,
only when I went into the cafe on September 9, 1930;
I walked up and down there by the school and then went
back to the cafe; I was there about 2:30 P. M. and saw him
there; he was sitting down on a chair at a table.   As you
enter the place, he (Dominick) was sitting at a table at
the right, sitting on the westerly side of the table, facing
east.

" Q. What did you do as you walked in and saw him

sitting at the table?  A. I just saw him there and gave it to him.

" Q. How many steps did you take inside the door? A. I could have seen him from outside; I stood right at the edge of the door and turned around to the right and took out my gun from between my pants and my outside shirt, right side, I turned around with my gun in my hand and discharged the revolver at him.

" Q. What happened after you fired the first shot at him?  A. I just pulled the trigger of the gun three times and then I went away.  After the first shot I saw his body lean forward on the table and I fired two more shots, and then I ran away, going downtown.

" Q. Did you say anything to Dominick at all as soon as you entered the cafe?  A. No, because I saw him from the outside; I said nothing to him because I took no chance with him as I heard he was a big guy there and takes nothing from anyone, so I would take no chance with him.

" After I discharged my automatic pistol at him three times, I ran south on 1st Avenue to 116th St. on the west side of the avenue and then went west to Lenox Avenue, turned around on my right and went to 120th St. and Lenox Ave., walking on the east side of Lenox Avenue to 120th St.  I went there just to give the gun to some one; I just looked in the barber shop there on 120th St. between Lenox Ave. and Nathan Davis St.  I wanted to give it to anyone there, Jerry or Frank, but I didn't see anyone in there.

" Q. What did you do then?  A. Then I threw the gun in an ash can; I wrapped it up in newspaper and threw it in the ash can there, the ash can was down three steps inside a little alley there right next to the barber shop, the house east of the barber shop.  Then I went walking around through Central Park and moped there all night; I slept in the subway station at 116th St. and Lenox Ave., then riding up and down in the subways.

" Q. From the time you shot Dominick Buoncore until last night, you just moped around, is that right? A. Yes; I got acquainted with a fellow named Nick Larose in a candy store at 112 Skillman St., I'd stay there and take care of the place in the night time and clean up for him and he'd give me fifty cents. Sometimes I went to the baths down on Manhattan Ave., I think it was the Royal Baths.

" Q. How did you know this man Harrington? A. The time I got picked up for counterfeiting I met him at the lineup there and he told me all about it, that he was going up for $7\frac{1}{2}$ to 15 years and he said I should take the rod at his house and save it for him.

" Q. Where was the rod? A. His mother had it. I met the mother in the street and she gave it to me. I don't know her name, I just know her from going up to the house. I met her at 118th Street and 3rd Ave., northwest corner, the entrace is on 118th St. I met her at 118th St. & 3rd Ave. and told her about seeing her son and to give me the gun and she told me to wait; she came back and gave me the gun. I never knew her name because the son took me up there and I would not know it if I heard t."

The defendant admitted when he was on the stand that all these answers were made by him. They are the words used by him; he does not claim that any officer made or even attempted to make any of the answers. He does say, however, when a witness in his own behalf upon the trial, that the whole story as given by him was false, was the invention of the police, and that he simply repeated what previously had been told him and rehearsed by them. This is incredible. It may be that the police at times have used violence to procure a confession, but I cannot believe that the police officers of our city, including in this instance officers of high rank, have deliberately framed a story and compelled a man they knew to be innocent to confess it as the truth. The jury was

justified in discrediting the defendant upon his own statements in court, where it had a chance to hear and see him. He was contradicted by his own friend, the owner of the cafe, Joseph Panico. The defendant swore upon the stand that he was not in the cafe on September 8, the day before the shooting. Panico, the owner, swears that he was.

Again, the defendant swears that he was beaten so badly by the police, before he confessed, that his shirt was all bloody, and in this condition he appeared a few hours afterwards before P. Francis Marro, the Assistant District Attorney, who took his second statement. This second confession is in substance the same as the first. Marro and his stenographer testified that the defendant did not show any symptoms of having been beaten by any one. The police officers also testified that no violence was used upon him.

Under these circumstances and conditions I cannot bring my mind to believe that the defendant's confessions are false or that they were obtained through fear produced by threats. If this was all we had in this case I should vote to affirm the conviction. It is not all. There are some other things appearing which cause me to hesitate. How near we get to the actual truth from human testimony, none of us will ever know, unless we are the actual participants in the event. Nothing is so uncertain as certainty. The best we can do in arriving at conclusions, in law cases, is to take the evidence presented and give it such weight as it is worth. When we begin to speculate we are lost. And yet the mind will have its doubts, which spring frequently from little things. My curiosity has been aroused, and, being required to review the facts, I am justified in asking a few questions. Better ask them now than after Mummiani has been put to death. The answer may then come too late. Although I can find no fault with the jury convicting this defendant, I, myself, am unwilling to vote to send

him to his death until I know more about Cherry, whom the District Attorney introduced to the jury, and then for some unaccountable reason, failed to call.

Patsy Cherry, whose real name is Patsy Cerosuolo, for two weeks had been a frequenter of the coffee house, and was well known to the proprietor Panico. On the day before the shooting, September the 8th, Cherry and Dominick Buoncore had attended the funeral of one called Murphy, whose real name was James Marano. On the day of the shooting, Patsy Cherry, a man named Louis Scalzi and Dominick Buoncore were seated together at a table in Panico's coffee house, just before Buoncore met his death. Scalzi was called out, and Cherry left, apparently to talk to his wife, Fanny, who was outside. The next instant Buoncore was shot as he was seated at the table. The defendant, on the stand, as a witness for himself (not in the confessions), says that he had been in the cafe with Cherry taking coffee at Cherry's invitation, and that as Cherry was called out, he followed him and waited on the street to talk with him further after he, Cherry, had finished talking with his wife. The defendant denies doing the shooting and says that when he heard the shots he ran away. All admit, therefore, that Cherry was in the coffee house, and at the place at the time of the shooting.

Buoncore did not die at once, but was alive at the time the police officers arrived. He was asked who shot him. If anybody knew, surely Buoncore knew who shot him. He answered, mumbling, " Moriano, Moriano, see Patsy Cherry." He signed a paper with his mark for Officer Winter, saying, " Moriano shot me." And Officer Minervini wrote it in his police notebook, the entry being: " Received wounds by a man known as Moriano and Patsy Cherry had altercation with them in cafe at above premises was shot by 32 cal. automatic."

The defendant is not Moriano, and was never known by that name. It was suggested, and probably is true,

that the deceased pronounced the name " Mummiani " as though it were " Moriano." Nevertheless, two officers heard the name and recorded it " Moriano." Cherry was there and knew something. Buoncore said just as he was about to die, " See Patsy Cherry." The officers and the District Attorney saw Patsy Cherry; he was in the courtroom during the trial. The District Attorney, in opening to the jury, addressed them as follows: "At about a little after 2:30 or between 2:30 and 2:45 Patsy (Cherry) received a call to go outside. Patsy had a girl who was calling for him. *He will tell you that himself.* And he left Buoncore seated at the table and he went outside and turned around to the left and went into the hallway where his girl was standing, and had some conversation. As he went out he saw this defendant standing at the railing, and just as he got into the hallway and was talking to this girl he heard four shots fired. He and the girl dashed out and saw a number of men running away, amongst them this defendant."

The District Attorney failed to call Cherry or his wife, Fanny, and in no way accounted for not doing so. In his summation the District Attorney said: " Before I drop Panico, let me say why didn't I put Mr. Cherry on the stand, or why didn't we produce Mr. Cherry? " He did not say.

Why this mystery about Cherry? He was there and knows something. Why is it kept from us, leaving us in doubt as to what it is? The defendant said he was drinking coffee with Cherry. Panico and the District Attorney say Cherry was with Buoncore. The latter, when asked who shot him, said, " See Cherry." Cherry has been seen by the prosecuting authorities, he was available, he was in court, and no explanation has been made for not calling him. What did he see? I, for one, would like to know.

If Cherry was friendly to the defendant and trying to shield him, why did not the defendant call him? If he was hostile to the People, his hostility could be proved as a

fact. (2 Wigmore on Evidence, § 948.) If there was sufficient evidence to justify the belief that he was aiding and assisting Mummiani, he should have been indicted; if there was no such evidence, the District Attorney could have called him as a witness for whatever his testimony was worth. Cherry must know something. The District Attorney must know what it is; perhaps the defendant's counsel knows; we do not. It may be nothing at all. Perhaps Cherry has stated that he knows nothing about the affair and saw nothing. How can we tell, as reviewers of the fact, what Cherry's position is? I, for myself, do not intend to guess about the matter. My vote shall be to send this case back in order that this uncertainty may be cleared up. Life, when voluntarily given, is sometimes held very cheap; when taken, however, by the arm of the law, it should be held very dear. On the confession of Mummiani I believe him guilty. The mystery surrounding Cherry makes me hesitate. As this mystery can be cleared up upon a new trial, I vote for a reversal and a new trial.

O'BRIEN, J. No member of this court expresses a reasonable doubt of defendant's guilt. An extraordinarily remote possibility of his innocence, such as may be present in practically every case, or a vague suspicion that his confession may have resulted from threats and violence ought not to impel a court of review to overthrow a verdict founded on such convincing evidence.

The fact that a confession is made at a time when a prisoner is illegally detained in custody, contrary to the provisions of section 165 of the Code of Criminal Procedure which require that a defendant must in all cases be taken before a magistrate without unnecessary delay, does not render it inadmissible. (*Balbo* v. *People*, 80 N. Y. 484, 499.) Nevertheless holding a defendant in durance, prior to formal complaint to a magistrate, is without legal sanction and is condemned. Evidence of confessions under such circumstances, if not obtained

in conflict with section 395 of the Code of Criminal Procedure, cannot, however, be properly excluded. (*People* v. *Trybus*, 219 N. Y. 18, 22.) This principle is similar to the one embraced within the rule that a court, when engaged in the trial of a criminal case, will not take notice of the manner in which witnesses have obtained possession of papers, burglars' tools and intercepted telephone messages which are material and are properly offered in evidence. (*People* v. *Adams*, 176 N. Y. 351; affd., 192 U. S. 585; *People* v. *Defore*, 242 N. Y. 13; *Olmstead* v. *United States*, 277 U. S. 438.)

After a murderer has confessed to the commission of a crime of which he is guilty, what conceivable chance of escape remains to him except a charge against the police that they have used threats and force to extort his confession? In *People* v. *Doran* (246 N. Y. 409, 429) Judge ANDREWS refers to such a charge as a " standardized defense." Whenever we have reached the conclusion that a verdict on this issue is against the weight of evidence, even though we may be convinced of a defendant's guilt, we have not hesitated to reverse the judgment of conviction. Recent instances can be found in *People* v. *Weiner* (248 N. Y. 118) and *People* v. *Barbato* (254 N. Y. 170).

I agree with Judge LEHMAN that upon this record the jury might reasonably credit the denial by the police of the use of threats and violence. I go further and agree with Judge CRANE that the verdict on this issue is fully supported by the evidence. Proceeding even further, a mere reading of defendant's story of his pretended beating impresses me with the belief that it is absolutely untrue. Absence of blood on defendant's coat, his vest and his underclothes goes far to prove the truth of the testimony by police witnesses. Defendant never complained to the prison physician, the District Attorney or the magistrate that he had been beaten. He did ask the doctor for zinc oxide ointment and the doctor gave him some zinc salve

which is sometimes used in treatment for acne. He was afflicted with that ailment. A complaint of brutality within a few days subsequent to his arrest could readily have been demonstrated or disproved. Opportunities were abundant. That he refrained from availing himself of the natural inclination to announce a wrong, if one existed, is most significant and his omission, considered with the other evidence, may be assumed to have properly convinced the jury. After he confessed to the police, his admissions were renewed to the District Attorney. No effort is made to show that his later avowals of guilt were induced by threats or force. He reserved for the jury the defense that his admissions to the police had been extorted. To my mind the presence of police officers during defendant's confession is no more a suspicious circumstance than in *People* v. *DeVore* (258 N. Y. 568). In that case three boys nineteen and twenty years of age confessed while in the custody of the police prior to arraignment. Each stated that he was not beaten or threatened but on the contrary was courteously treated. Nevertheless four detectives were present during their examinations by the District Attorney. Adequate police administration may and probably does require that the arresting officers and other detectives shall be kept immediately informed of the progress of each phase of the case to which they are detailed. The jury in this case did not believe that such officials always lie or that they are incapable, in a spirit of charity, of supplying a dishevelled prisoner with a clean garment to replace one in a ragged and filthy condition. This jury was willing to admit that even a policeman is not bereft of elementary humane feelings. I think that it was justified in accepting the testimony of these officers rather than the belated statements of a murderer.

The dying declaration of the deceased was before the jury and they could accept it for what it was worth. It is certain that his auditors were unable to distinguish his words as he articulated them. They agree that he was

"mumbling." The first officer to arrive after the shooting thought that the expiring victim told him that he had been wounded by "Moriano" and Patsy Cherry. The same witness also testified that after a second policeman appeared on the scene, decedent still "mumbling" said that he was shot by Moriano, "see Patsy Cherry." If we conclude, as I think we must, that defendant's confession was not the result of threats, then the name Moriano must be viewed as of no importance. Either the dying man was unable to pronounce the name Mummiani, or his hearers were unable to distinguish it. The jury was capable of appraising the value of the witness' evidence when he testified that on one occasion he thought that Buoncore told him that Patsy Cherry assisted in the shooting and that on another occasion he thought that the victim said "see Patsy Cherry." Patsy Cherry was in the courtroom during the trial. Defendant had the same opportunity as the District Attorney to call him as a witness. Why should suspicions be aroused by the failure of only one party to call him? The truth is, that, if defendant's confession was not involuntary, Buoncore's incoherent declaration and Patsy Cherry's omission to take the stand at the behest of either party are entirely without significance. Probably no case comes to this court which can be said with a feeling of perfect certainty to be utterly devoid of all conceivable doubt or to have been tried without an infinitesimal flaw of legal error. Seldom, it seems to me, is the correctness of any judgment more nearly grounded on certitude.

I vote to affirm.

LEHMAN, J., in opinion, votes for reversal and a new trial; CARDOZO, Ch. J., and POUND, J., concur; CRANE, J., in separate opinion, also votes for reversal and a new trial; O'BRIEN, J., in opinion, votes for affirmance, with whom KELLOGG and HUBBS, JJ., concur.

Judgment of conviction reversed, etc.