UNITED STATES of America, Plaintiff-Appellee,

v.

Frank R. COPPOLA, Defendant-Appellant.

No. 43, Docket 25177.

United States Court of Appeals Second Circuit.

Argued March 9, 1959.

Reargued Before the Court En Banc, Dec. 15, 1959.

Decided May 20, 1960.

James W. Knapp, Staff Asst., Department of Justice, Washington, D. C. (John O. Henderson, U. S. Atty., Western District of New York, Buffalo, N. Y., Leo J. Fallon, Sp. Asst. U. S. Atty., Western District of New York, Buffalo, N. Y., on the brief), for plaintiff-appellee.

William B. Mahoney, Buffalo, N. Y., for defendant-appellant.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge.

Subsequent to the argument and decision of this case by the original panel, the United States petitioned for a rehearing *en banc* as to the defendant, Frank R. Coppola. 28 U.S.C.A. § 46(c). Because of the importance of the question involved, the petition was granted and a second argument was heard by all the active judges of the court.

The defendant, Frank R. Coppola, was convicted, after a trial by jury in the Western District of New York, on all three counts of an indictment charging violations of 18 U.S.C.A. § 2113(a) and (b). The first count alleged that defendant on or about February 15, 1956 by force, violence and intimidation, took approximately $52,529 from a branch of the Manufacturers and Traders Trust Co. in Buffalo, New York, said company being a member of the Federal Reserve System; the second count charged defendant with entering that bank with intent to commit larceny; and the third count charged him with taking and carrying away from that bank, with intent to steal, the sum of approximately $52,529.

Coppola's sole contention on this appeal is that admissions made by him, oral and written, were improperly received in evidence against him. He claims that these admissions were made during an illegal detention[1] by the Buffalo police acting under a "working agreement" with the F. B. I. and that the admissions should therefore have been excluded under Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829. We do not agree. We conclude upon an analysis of the facts that the trial judge properly found that the F. B. I. in no way caused or contributed to Coppola's detention by the Buffalo police. Consequently, the doctrine of the Anderson case is inapplicable and the judgment is affirmed.

To resolve the issues here presented a thorough review of the circumstances under which the admissions were given

---

[1]. The government concedes that the delay of several hours by the local police in arraigning Coppola constituted an unlawful detention under New York law. See People v. Lovello, 1956, 1 N.Y.2d 436, 154 N.Y.S.2d 8, 136 N.E.2d 483. In our view, however, whether a detention is illegal under state law has no bearing upon the propriety of receiving admissions in evidence in a federal criminal proceeding.

Had the arrest and subsequent delay in arraignment been occasioned by federal officers, it is most probable that Coppola's detention would have been in violation of Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. See McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

must be made. On January 4, 1957 the butcher shop of Paul Redlinski, in Buffalo, New York was robbed. The robbery was under investigation by the Buffalo police. On January 7, 1957 the Agent-in-Charge of the F. B. I. in Buffalo, John A. Roche, relayed to John M. Golombeck, Chief of Detectives of the Buffalo police, information that the defendant Coppola and two others, D'Antuono and Simmons, had committed the robbery. Roche furnished Golombeck with photographs of these three individuals. Redlinski identified Coppola. On January 9, 1957 Roche again communicated with Golombeck and informed him that the F. B. I. had information that the same three individuals were contemplating a holdup at 10:00 A.M. the next morning, January 10—probably of the El Chico Tavern on Clinton Street, in East Buffalo. Roche also gave the same information to John Dwyer, District Attorney of Erie County "so that he might take whatever action he desired to protect the citizens of Buffalo and prevent, if possible, another holdup." He also told Dwyer that the F. B. I. had been investigating Coppola in connection with the holdup by two masked men of the Clinton-Bailey branch of the Manufacturers and Traders Trust Company on February 15, 1956 and the robbery of the Linwood Branch of the Liberty Bank of Buffalo on October 2, 1956.

Having received this information, the Buffalo police stationed details from their own force in five different taverns where they suspected the holdup might take place. On the morning of January 10, Golombeck and two other members of the Buffalo police force were in a car in the vicinity of the El Chico Tavern. Observing a car in which Coppola, D'Antuono and Simmons were the occupants, the police officers intercepted them and took them to Buffalo police headquarters. Sometime thereafter, but before noon, Golombeck advised Roche of their apprehension. Roche, Golombeck, Dwyer and Klenk (a member of the Buffalo Police Department) had lunch and thereafter, with Dwyer, Roche visited Coppola in

police headquarters. Dwyer told Coppola that he was interested in him in connection with a series of crimes and specifically questioned him about the Redlinski robbery. Roche questioned Coppola briefly about the M. & T. robbery, but left to secure a form permitting a search to be made of Coppola's home. Although he had originally stated that he had no objection to a search, when Roche returned with the form, Coppola declined to sign it and no search was made. The afternoon and early evening at police headquarters was taken up largely by various appearances of the three individuals in the "show-up" room and with interrogation by the Buffalo police concerning the Redlinski robbery, a robbery on East Eagle Street, Buffalo, and a crime in Niagara Falls, all state offenses.

Later that evening, at about 9:00 P. M., after a second "show-up" at police headquarters, agents of the F. B. I. talked to the prisoners about the bank robberies. During the course of these interrogations (commencing at about 9:40 P.M.), the admissions which were received in evidence were made by Coppola. The next day, January 11, before noon, the F. B. I. requested that Coppola be delivered to them so that he could be arraigned on the federal charges. He was not delivered immediately but first arraigned by the Buffalo police, at about 2:00 P.M., before a local magistrate in the City Court of Buffalo. Thereafter he was turned over to the F. B. I. and promptly arraigned before a United States Commissioner.

At the trial Coppola urged that his admissions should be suppressed. A hearing was held by the trial court without the presence of the jury at which members of the Buffalo police force and the F. B. I. testified. The court concluded that the statements were not obtained by means of coercion or unlawful collaboration between local and federal officials and denied the motion to exclude the evidence.

In Anderson v. United States, supra, the Supreme Court held that admissions

made to F. B. I. agents during a detention by state officers, who were acting at the behest and upon the instructions of the federal officials, were inadmissible because the detention was under circumstances unlawful under the rule of McNabb v. United States, supra, later codified by Rule 5(a) of the Federal Rules of Criminal Procedure. In that case property owned by the Tennessee Valley Authority, a corporation in which the United States is a stockholder, had been damaged by dynamiting—a violation of the Federal Criminal Code. F. B. I. agents were called in to investigate. Various suspects were taken into custody by the local sheriff and detained in a building. The questioning, however, with relation to the federal crime was carried on by federal officers over a period of days. No state criminal charges were preferred during the period of detention or at any time thereafter against the defendants. There is no indication that the state officers participated in the interrogation or were endeavoring to solve any state crime. Upon the facts it was quite apparent that the state detention was solely to enable federal officers to pursue their investigation and that the federal agents were responsible for the long delay in arraignment. Hence, the Supreme Court concluded that there existed a "working arrangement" between the federal officers and the local sheriff and that the sheriff was in effect acting as an agent for the F. B. I.

Coppola urges that the facts surrounding his detention fall within the scope of the Anderson decision. We do not agree. The differences in the facts are signficant. Here Coppola and his two companions were arrested by the Buffalo police on their own initiative because of information that they had committed and were about to commit a crime or crimes in violation of state law. The arrangements to intercept and detain the three men on the morning of January 10 were exclusively planned and executed by the Buffalo police without any suggestion or participation by the F. B. I. In fact Coppola's counsel specifically stated that "I do not claim that the Buffalo police made an arrest at the behest of the F. B. I." The arrest and detention were not to aid or abet the F. B. I. in their investigation or for the purpose of enabling them to interrogate the persons apprehended about federal matters while in state custody. The apprehension and the detention were for questioning about the Redlinski robbery and other local robberies exclusively within the jurisdiction of the Buffalo police. At police headquarters after the arrest, the Buffalo police questioned Coppola and his companions concerning the state offenses. The record shows that the state concentrated on its own business first. These investigations and the necessary appearances in the local "show-ups" occupied most of the day. Coppola could not have been arraigned after 5:00 P.M. on January 10, 1957 in the Buffalo City Court.[2] The next time he could have been arraigned was the following morning so that F. B. I. interrogation that evening did not contribute to any delay in arraignment. When questioned by the F. B. I. agents, Coppola was fully advised that he did not have to make a statement, that any statement could be used against him, and that he was entitled to advice of counsel. However, he indicated a willingness to talk and dictated a statement which was taken down in handwritten form, read over by him and then signed. Coppola had had grammar school and junior high school education as well as an accounting course for approximately a year at a business college. He was able to read and understand that which he signed. There is no evidence of any coercion, mistreatment or abuse. There is no claim made that there was any delay in arraignment by the F. B. I. or that any admissions were made during the period between his release by the local authori-

2. Both counsel agreed to this fact upon the oral argument on December 15, 1959.

ties and his arraignment before a United States Commissioner.

The cases other than Anderson v. United States, supra, cited by Coppola's counsel involved fact situations wholly different from that of the case before us. In Byars v. United States, 1926, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520, a federal officer accompanied state officers on an illegal search and seizure. There upon the facts the court held that the illegal search "was a joint operation of the local and federal officers" and that "the effect is the same as though [the federal officer] had engaged in the undertaking as one exclusively his own." Id., 273 U.S. at page 33, 47 S.Ct. at page 250.

In Gambino v. United States, 1927, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293, state officers conducted an illegal search and seizure looking for intoxicating liquor in the days of the National Prohibition Act. The court held that the action of the state troopers in endeavoring to enforce the Act was such that it could be said that the illegal search was "solely for the purpose of aiding in the federal prosecution." Id., 275 U.S. at page 315, 48 S.Ct. at page 138.

McNabb v. United States, supra, involving as it does an arrest and detention solely by federal officers without participation by local officials, is also not controlling upon us in this case.

In complete contrast with the cases upon which appellant relies, there is in this record no basis for the conclusion that the apprehension and continued detention of Coppola and his two companions was at the behest of federal officers or for the purpose of aiding any investigation they wished to conduct. That the Buffalo police notified the F. B. I. of the defendants' apprehension would be normal police procedure. Only by such an interchange of information can society be adequately protected against crime. The custody of the defendants after arrest was exclusively that of the Buffalo police, as was their interrogation. However, once the F. B. I. knew of the defendants' arrest, it was their duty to endeavor to ascertain all the available facts about the federal crimes which they were investigating. To do this the F. B. I. agents were obliged to conduct their interrogation in the local police station and of course to obtain consent of the local police. That the apprehension and detention were exclusively for state crimes is reflected by the fact that, except for the brief conversation in the afternoon when permission was sought to search Coppola's home, not until well along in the evening was any opportunity given to the F. B. I. to question the defendants concerning the matters in which the federal officers were interested.

Appellant argues that from February 15, 1956, the date of the M. & T. bank robbery, until defendants' arrest on January 10, 1957, the Buffalo police and the F. B. I. collaborated in trying to solve the crime, and from this fact would draw the conclusion that there must have been a "working arrangement" between them. Mere words however, such as exchange of information, cooperation, collaboration, or even "working arrangement" do not carry within themselves any solution to the difficult problems of federal-state relations here involved. If this cooperation reached the point of arrest and detention by local police for the purpose of enabling federal officers to question the defendants concerning the bank robberies for a period of time forbidden to federal officers by Rule 5(a) of the Federal Rules of Criminal Procedure, admissions thus obtained would properly be excluded. Such a rule prevents federal officers from evading the letter and the spirit of Rule 5(a). The rule excludes confessions when the "working arrangement" includes the illegal detention—in other words, when federal law enforcement officers induce state officers to hold the defendant illegally so that they may secure a confession. However, to bring a case within this rule there must be facts, as there were in Anderson, not mere suspicion or conjecture. Here, as in United States v. Abel, 2 Cir., 1958, 258 F.2d 485, 494, affirmed, 1960, 362

U.S. 217, 226–230, 80 S.Ct. 683, 4 L.Ed. 2d 668, rehearing denied, 1960, 80 S.Ct. 1056, there is no basis on which this court can properly reverse the conclusion of the district judge. The Supreme Court's decision in that case makes plain that the mere fact that two or more agencies have the same crime or the same suspects on their books and that they are cooperating to achieve a solution does not make one the agent of the other and thus responsible for the other's acts.

If there is to be effective law enforcement, it is to be expected that every police agency, be it state, county, city or federal, will cooperate and exchange information. Probably the F. B. I. and local police have in countless cases the same crimes and the same suspects on their books. Undoubtedly after the Liberty Bank robbery in the present case, both state and federal agencies had the crime under investigation. However, there is no evidence that the F. B. I. had any knowledge whatsoever of the action the Buffalo police might take as a matter of local law enforcement. Nor is there any reason why the local officials should have discussed their proposed action with the F. B. I. In the absence of any evidence of collaboration to achieve an unlawful end, we would not be warranted in creating a rule whereby prior cooperation of state and federal officials in the investigation of crime would prohibit the admission of uncoerced confessions made during a detention by state officers which the Federal officials did not induce and were powerless to prevent.[3]

The judgment of conviction is affirmed.

CLARK, Circuit Judge.

I dissent. I concur in Judge WATERMAN'S dissenting opinion.

WATERMAN, Circuit Judge.

I dissent.

There are two separate appeals before the court sitting *in banc*. The first appeal is from Coppola's conviction upon the indictment arising out of the robbery of the Manufacturers and Traders Trust Company on February 15, 1956. The second is from his conviction on three counts of aiding, abetting, and counseling four defendants who robbed the Liberty Bank of Buffalo, Linwood Branch, on October 2, 1956. The indictments in both cases were filed on February 4, 1957. The Manufacturers and Traders Trust Company case in which Coppola was charged with physically participating in the actual robbery was tried in July 1957, before Judge Brennan of the Northern District of New York, sitting in the Western District by designation, and a jury. Coppola was sentenced to 20 years. The second case in which Coppola was charged with having aided, abetted and counseled those who entered the bank though he did not actually participate physically in the holdup was tried in November 1957 before Judge Morgan and a jury. Coppola was sentenced to another 20 years to be served consecutively to the 20 years imposed upon him by Judge Brennan. Coppola did not testify before the jury in either case.

The indictments were filed after Coppola had been apprehended by Buffalo police officers in the forenoon of January 10, 1957 and after he had been interrogated that evening and in the early hours of January 11, 1957 by agents of the Federal Bureau of Investigation. Incriminating admissions concerning his implication in the two bank robberies were made by Coppola to the agents at that time. The Government at trial

---

**3.** Recent decisions of other circuits in cases involving facts similar to those here have rejected attacks upon the admissibility of evidence obtained by federal agents during a state detention on the ground that the relationship between the local and federal authorities was not comparable to the "working arrangement" described in Anderson v. United States, supra. See White v. United States, 5 Cir., 1952, 200 F.2d 509; also Carpenter v. United States, 4 Cir., 1959, 264 F.2d 565, certiorari denied, 1959, 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548; Stephenson v. United States, 6 Cir., 1958, 257 F.2d 175; Papworth v. United States, 5 Cir., 1958, 256 F.2d 125, certiorari denied, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88.

sought to introduce these admissions into evidence, and the attorney for Coppola requested and received a hearing outside the presence of the jury for the purpose of having these admissions suppressed. Judge Brennan in the first case, and Judge Morgan in the second, refused to suppress, and each Judge ruled that the statements were admissible in evidence. From these rulings defendant appealed.

The appeals were heard at the same time by a panel of this court composed of Judge Washington of the Court of Appeals for the District of Columbia Circuit, sitting with us by designation at our request, and Judges Waterman and Moore. Argument was had on March 9, 1959, and the majority opinion of a divided court was filed July 20, 1959. The Government petitioned for a rehearing *in banc* which was granted.

The Government maintained in its rehearing petition that the panel majority had misapplied the rule expressed by the Supreme Court in Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 to the facts of the apprehension, detention, and interrogation of Coppola; and that a proper application of the rule to the facts would have required affirmances instead of reversals of the trial rulings. The *in banc* majority finds that the Government's contention has merit. I disagree. The *in banc* majority's efforts to sustain the different result they reach here from the

result the Supreme Court reached in Anderson by attempting meaningfully to distinguish the facts in the two cases appears to me to have been a failure.

The passage of time, the reargument before the *in banc* court, and the *in banc* majority opinion have only served to reinforce my belief in the validity of my July 20, 1959 opinion, the opinion in which Judge Washington joined. Therefore, I insert as part of this dissent that entire opinion with its footnote, and, after quoting it, I will comment upon the content of the majority opinion from which I am now dissenting.

OPINION OF THE PANEL
MAJORITY IN DOCKET
NO. 25177 [1]

[Found at pp. 1759–1766 of Second Circuit printed opinions October Term, 1958]
(Argued March 9, 1959
Decided July 20, 1959.)

———◆———

The United States of America,
*Plaintiff-Appellee,*

—v.—

Frank R. Coppola,
*Defendant-Appellant,*
—and—
Dario D'Antuono, a/k/a
"Danny" D'Antuono,
*Defendant.*

[1]. The majority opinion of the panel in the second case, No. 25257, 281 F.2d 354, relating to the Liberty Bank holdup, insofar as it related to Coppola's appeal, referred to the opinion in Docket No. 25177, and its disposition was governed by the same considerations. All that I said there that has any bearing on the matters now before us is found at 281 F.2d 356, and reads as follows:

*"Defendant Coppola*
"During the course of the trial a member of the FBI, Gordon Eddy, was produced as a witness by the Government. He sought to give testimony relative to an oral confession made to him by Coppola. The latter moved to have this evidence suppressed, but after a hearing

conducted out of the presence of the jury the district court permitted the testimony. As was proper, however, it carefully instructed the jury that Eddy's testimony relative to Coppola's oral confession was not to be considered binding upon Simmons or upon Millio.

"The evidence produced at that hearing reveals that the oral admissions testified to by Agent Eddy were made at the same time and under the same circumstances as those described in United States v. Frank R. Coppola, 2 Cir., 1959, decided this day. Therefore, for the reasons given in that decision, we hold that the testimony was improperly allowed against Coppola and that he is entitled to a new trial."

"Before WASHINGTON, WATERMAN, and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

The defendant, Frank R. Coppola, was convicted, after a trial by jury in the Western District of New York, on all three counts of an indictment charging violations of 18 U.S.C. § 2113(a) and (b). The first count alleged that defendant by force, violence and intimidation, took approximately $52,529.00 from a Buffalo, New York branch of the Manufacturers and Traders Trust Co., said company being a member of the Federal Reserve System; the second count charged defendant with entering that bank with intent to commit larceny; and the third count charged him with taking and carrying away from that bank, with intent to steal, the sum of approximately $52,529.00. Defendant's sole contention on this appeal is that admissions by him, oral and written, were improperly allowed into evidence. As a result of those claimed errors, he seeks a new trial.

The facts necessary for a determination of this question follow. On February 15, 1956 the Clinton-Bailey Branch, in Buffalo, New York, of the Manufacturers and Traders Trust Co. was held up and robbed by two masked men. The defendant was a suspect as early as February 20, 1956, five days after the robbery, but no arrest was made. Subsequent to that time the FBI received the aid of a confidant of defendant. As a result of that aid the FBI came to believe that defendant was responsible for an unrelated crime, a robbery of a local butcher; and John A. Roche, Special Agent in Charge of the FBI in Buffalo, communicated that belief to John Golombeck, the City of Buffalo Chief of Detectives, on January 7, 1957. By means of photographs of defendant supplied by the FBI to the city police the butcher identified defendant. On January 9, 1957 Roche again contacted Golombeck and informed him that defendant and two others were planning to rob a tavern in East Buffalo the following day. Roche then communicated the same information to the County District Attorney, and told him that defendant was also a suspect in a bank robbery. About 9:30 A.M. on January 10, 1957 Golombeck with two other Buffalo policemen arrested defendant and two of his companions. Golombeck then telephoned Roche that defendant had been arrested and was being taken to police headquarters. That afternoon when defendant was being interrogated by the County District Attorney, Roche was present. He questioned defendant briefly about his connection with the Manufacturers and Traders Trust Co. robbery. That evening two FBI agents, acting on orders from Roche, went to police headquarters, and there questioned defendant in his cell from 9:00 P.M. until about 12:45 A.M. on January 11. It was during this period that defendant made the incriminating statements involving him in the February 15, 1956 bank hold-up. These statements were then reduced to writing. Thereafter, at 11:00 A.M. on January 11, 1957, the FBI requested that defendant be turned over to them. However, the federal officers did not obtain custody of Coppola until about 4:00 P.M. on that day. In the meantime, after the FBI request, at about 2:00 P.M. that day defendant was arraigned in the City Court of Buffalo. This was the first time he had been brought before any magistrate after he had been picked up at mid-morning of the previous day. After he was turned over to the FBI he was promptly arraigned before a United States Commissioner. Although Roche and the local police testified to a spirit of cooperation between their respective law enforcement departments, they denied that defendant was arrested by the police officers at the FBI's request. Defendant made a timely motion at the trial to suppress all evidence of his admissions. After a hearing out of the jury's presence the district court denied the motion to suppress. He held that, as a matter of law, there "was no unusual delay" of a nature that should foreclose the introduction of the evidence of the Government concerning the defendant's incrim-

inating statements made to the federal agents while he was held by the Buffalo police.

If federal officers had picked up the defendant and had incarcerated him from approximately 9:30 A.M. on January 10, 1957 until after midnight that night and during that time had interrogated him to the extent of the interrogation here, there would seem to be little doubt that his detention would have been in violation of Rule 5(a) of the Federal Rules of Criminal Procedure and that defendant's admissions made to the federal agents would have been inadmissible as evidence against him. Mallory v. United States, 1957, 354 U.S. 449, 77 S. Ct. 1356, 1 L.Ed.2d 1479; Upshaw v. United States, 1948, 335 U.S. 410, 69 S. Ct. 170, 93 L.Ed. 100; McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, rehearing denied, 1943, 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727. However, the question before us that we must decide is whether the admissions made here, inasmuch as they were obtained by federal officers while the defendant was in the hands of local police, are also inadmissible.

The leading case on this point is Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829. There, following a dynamiting of steel towers and TVA power lines, the defendants were arrested by the county sheriff and imprisoned without arraignment in violation of the state law. During their periods of illegal detention, which ranged from two to six days, six of the defendants were questioned intermittently by federal officers and finally confessed to the dynamiting. After they had confessed they were arrested by the federal officers and then arraigned before a United States Commissioner. Relying upon McNabb v. United States, supra, decided the same day, the Supreme Court held that the confessions so obtained were inadmissible at the trials. With respect to the fact that the illegal detentions were by local police, it said:

"There was a working arrangement between the federal officers and the sheriff of Polk County which made possible the abuses revealed by this record. Therefore, the fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers." 318 U.S. at page 356, 63 S.Ct. at page 602.

The Government, on the present appeal, asks us to construe this ambiguous language—i. e., "a working arrangement"—so as to require, in order to prohibit the use in federal courts of confessions obtained by federal officers during an illegal detention by the local police, that the illegal detention be at the instance or at the request of federal officers. Clearly such an interpretation of the phrase "working arrangement" would result in an affirmance of the decision below, for the facts surrounding defendant's arrest do not, in our opinion, require the inference that the Buffalo police acted upon the request of the FBI, expressed or implied. Both the FBI agents and the Buffalo police denied that any such request was made.

However, we cannot accept the Government's construction. We must follow Supreme Court decisions as we read them, and not attempt redefinition of them. A careful reading of Anderson convinces us that the position urged upon us by the Government is a misinterpretation of that decision. The Court was careful to point out there that the Anderson arrests were made by the county sheriff "on his own initiative," and that the prisoners were held in the custody of "the state officers" while they were being questioned by the FBI. There is no indication whatever by the Court that the sheriff and his aides were not detaining the prisoners in order to perform their own primary function, that of the investigation of a local crime. The only "working arrangement" spelled out by the facts of that case is the one we have here—such cooperation between federal and local police as permitted the former to interrogate the latter's pris-

oners during their detention by the latter. It is without significance that the detentions and questioning periods in Anderson lasted much longer than here. The Supreme Court has made it clear that McNabb v. United States was decided without regard to coercion, psychological or physical, Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, and Anderson was based on the principles which governed McNabb.[1]

The Fifth Circuit has placed a different interpretation upon Anderson than we do here, and the Supreme Court has declined to review its decisions. Horne v. United States, 5 Cir., 1957, 246 F.2d 83, certiorari denied, 1957, 355 U.S. 878, 78 S.Ct. 143, 2 L.Ed.2d 109; Brown v. United States, 5 Cir., 1955, 228 F.2d 286, certiorari denied, 1956, 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500, rehearing denied, 1956, 352 U.S. 861, 77 S.Ct. 27, 1 L.Ed.2d 71; White v. United States, 5 Cir., 1952, 200 F.2d 509, certiorari denied, 1953, 345 U.S. 999, 73 S.Ct. 1142, 97 L.Ed. 1405, rehearing denied, 1953, 346 U.S. 843, 74 S.Ct. 17, 98 L.Ed. 363; see Papworth v. United States, 5 Cir., 1958, 256 F.2d 125, certiorari denied, 1958, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88, rehearing denied, 1958, 358 U.S. 914, 79 S.Ct. 239, 3 L.Ed. 2d 235. However, a denial of a writ of certiorari imports no expression of opinion upon the merits of the decision wherein it is sought. Elgin, Joliet & Eastern Ry. Co. v. Gibson, 1957, 355 U.S. 897, 78 S.Ct. 270, 2 L.Ed.2d 193; Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, rehearing denied, 1953, 345 U.S. 946, 73 S.Ct. 827, 97 L.Ed. 1370; House v. Mayo, 1945, 324 U.S. 42, 65 S.Ct. 517, 89 L. Ed. 739, rehearing denied, 1945, 324 U.S. 886, 65 S.Ct. 689, 89 L.Ed. 1435; Atlantic Coast Line R. Co. v. Powe, 1931, 283 U.S. 401, 51 S.Ct. 498, 75 L.Ed. 1142; United States v. Carver, 1923, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361; Graeber v. Rhay, 9 Cir., 1958, 256 F.2d 556, certiorari denied, 1958, 358 U.S. 857, 79 S.Ct. 77, 3 L.Ed.2d 91. Consequently, we are quite free to disagree with the position taken by that Circuit; and, in the light of the factual setting of Anderson, we are of the opinion that we are obliged to do so.

Just as the "working arrangement" spelled out in Anderson v. United States is, in our opinion, present here, the other factor relied upon in that case to invalidate the confessions, an illegal detention under the applicable state law, 318 U.S. 350, 355–356, 63 S.Ct. 599, is present here also. An examination of the New York law convinces us that the detention of defendant without arraign-

---

1. In McNabb the Supreme Court had before it a violation of the congressional requirement that federal prisoners be promptly arraigned after having been apprehended. The Court stated that the purpose of this congressional requirement was to prevent any possibility that federal officers would engage in the abuses that sometimes accompany "secret interrogations," and the Court then decided that this prevention of abuses was so basic to a true administration of federal justice that federal courts would be derelict in the "duty of courts as agencies of justice and custodians of liberty" [318 U.S. 332, 63 S.Ct. 616] if they allowed themselves to countenance introduction into evidence of admissions obtained by federal officers from "secret interrogation of persons accused of crime."

No violation of this *congressional* requirement was involved in Anderson.

There the illegal detention was solely that of Tennessee officers. However, the Court saw that the basic problem that was present in McNabb was equally present in Anderson. As in McNabb the Anderson defendants were interrogated by federal officers while they were being illegally detained without arraignment. To be sure, the failure to promptly arraign was the act of the Tennessee officers who were thereby violating their own Tennessee law, but the interrogation in both cases was by federal officers. The Supreme Court held that it was just as much the duty of a federal court to exclude admissions obtained by federal officers during the Anderson "secret interrogation" as it was to exclude admissions obtained by federal officers when the delay in the arraignment, as in McNabb, was the act of federal officers.

ment from approximately 9:30 A.M. in the morning until he confessed late that evening, without any apparent reason (except for the purpose readily inferred), was illegal. People v. Lovello, 1956, 1 N.Y.2d 436, 154 N.Y.S.2d 8, 136 N.E.2d 483; People v. Snyder, 1947, 297 N.Y. 81, 74 N.E.2d 657; People v. Alex, 1934, 265 N.Y. 192, 192 N.E. 289, 94 A.L.R. 1033; People v. Mummiani, 1932, 258 N.Y. 394, 180 N.E. 94; People v. Trinchillo, 4th Dept. 1956, 2 A.D.2d 146, 153 N.Y.S.2d 685; People v. Redmond, 3d Dept. 1942, 265 App.Div. 307, 38 N.Y.S.2d 727; People v. Kelly, 3d Dept. 1942, 264 App.Div. 14, 35 N.Y.S.2d 55; People v. Calebressi, 3d Dept. 1931, 233 App.Div. 79, 251 N.Y.S. 603. The Government does not argue to the contrary.

The admissions were improperly admitted into evidence, and the defendant is entitled to a new trial.

Reversed and remanded."*

### COMMENTS UPON PRESENT MAJORITY OPINION

#### I

I believe that the efforts in the present majority opinion to distinguish the factual situation presently before us from that in Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 have been unsuccessful. An examination of the statement of facts in the Anderson case, supra, 318 U.S. at pages 352–355, 63 S.Ct. at pages 600–602, will reveal that there a state crime clearly was involved—the wilful destruction of power lines, see footnote 2 at page 352 of 318 U.S., at page 600 of 63 S.Ct. A state officer, the sheriff, acting "on his own initiative" took into his custody persons, including the eight Anderson petitioners, whom he personally suspected of participating in the dynamiting of the power lines. Moreover, to

suggest (as the majority opinion appears to suggest) that the sheriff or any of his deputies, or any other state officer, subsequent to the state arrests, did not interrogate persons they themselves arrested is to indulge in a surmise entirely unwarranted by anything that appears in the Supreme Court's opinion.[2] Finally, at the time of the arrests, detentions, and interrogations in Anderson in April 1940 there was no reason, as federal agents may believe there is now, for the federal agents to enlist state connivance in effecting the apprehension and detention of suspects. McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, rehearing denied, 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727, had not been decided then, and the federal agents could well have believed that the confessions obtained from the Anderson defendants would have been admissible in a federal court as proof of federal crimes even if the apprehension and detention of the confessing prisoners had been exclusively that of federal officers. Thus I believe that the majority here has entirely misread the Anderson case when they conclude that upon its facts "it was quite apparent that the state detention was solely to enable federal officers to pursue their investigation * * *".

Even had the facts in Anderson been as the majority here wishes them to have been, the rule of law which the majority here announce is incompatible with the theory upon which Anderson was decided. My colleagues appear to hold that, under Anderson, a confession to federal officers, prior to any arraignment, made by a prisoner detained in state custody, need not be excluded from evidence in a federal court unless the state arrest was made at the request of federal officers or unless the federal officers participated in determining the length of time the prisoner was to be detained prior to any ar-

---

* Judge Moore dissented but did not file his dissenting opinion in view of the grant of an *in banc* hearing and the result reached therein.

2. Indeed, the opinion of the Court of Appeals in the Anderson case, 6 Cir., 1941, 124 F.2d 58, 67 strongly suggests that the defendants *were* interrogated by the sheriff and his deputies subsequent to arrest.

raignment, state or federal.[3] Anderson was based upon the Supreme Court's decision in McNabb v. United States, supra, and its determination was governed by the same considerations. In McNabb it was held that a confession secured in a two-day interval between arrest and arraignment could not be admitted in a federal criminal proceeding. The requirement of prompt arraignment is intended to protect a prisoner from intensive interrogation prior to the time a magistrate can determine whether there is any probable cause for detention and can inform the prisoner of his right to counsel and his right to remain silent. Mallory v. United States, 1957, 354 U.S. 449, 453–454, 77 S.Ct. 1356, 1 L.Ed.2d 1479. A federal defendant has been equally deprived of this protection whether his confession, exacted during detention prior to an arraignment, is made to a federal agent in a city, state or federal jail, or in a Tennessee Y. M. C. A.

## II

But even accepting, *arguendo*, the majority's improbable interpretation of Anderson v. United States, supra, I doubt that Coppola's confession was properly admitted. Contrary to what one might conclude from the statement of facts found in the majority opinion, I find many indications in the records of these two cases that Coppola's arrest by state officials would never have occurred on January 10 but for the insistence of the agent in charge of the FBI in Buffalo, and further indications that the manner of Coppola's detention on that day and night was designed, at least in part, to satisfy the desires of the FBI. In reaching this conclusion one needs to consider only the testimony of FBI agents and of officials of the Buffalo Police Department.[4]

Robbery of a bank that is a member of the Federal Reserve System is both a federal and a state crime. The robbery of the Manufacturers and Traders Trust occurred on February 15, 1956 and in the ensuing eleven months the FBI and the Buffalo police worked closely together in investigating it (R. 562–63). On January 4, 1957 the butcher shop of one Paul Redlinski was robbed. On January 7, John Roche, agent in charge of the FBI's Buffalo office, telephoned John Golombeck, Chief of Detectives of the Buffalo Police Department, and informed Golombeck that the FBI had information that on January 4 Coppola and two others had robbed a butcher shop, proprietor unknown save for the first name "Paul" (R. 554). The Buffalo police then contacted Redlinski. On January 8th from

3. The present *in banc* majority opinion appears to suggest that the rule set forth by the panel majority in the July 20, 1959 opinion hinged upon the fact that the state and federal officers had cooperated in the prior investigation of the crimes to which Coppola confessed while in state detention. A closer reading of the opinion of the panel majority will reveal that this is incorrect. We stated: "The only 'working arrangement' spelled out by the facts of that case [Anderson] is the one we have here—such cooperation between federal and local police as permitted the former to interrogate the latter's prisoners during their detention by the latter." (P. 348). The panel majority would have reached its result even if the federal-state cooperation in the earlier investigation of the crime had been absent. However, under the rule of law which I understand the *in banc* majority of this court here to announce, and assuming, *arguendo*, the validity of this rule of law, the fact of federal-state cooperation in the prior investigation of the crime has evidentiary significance and militates against the conclusion which the majority reach. If federal and state authorities have worked closely together in the investigation of a case there surely is likelihood that this cooperation continued in determining (1) whether a suspect is to be apprehended at all, (2) by which law enforcement agency the apprehension is to be made, and (3) how long the suspect is to be detained by the apprehending agency prior to arraignment. See discussion under part II, *infra*.

4. The record references cited hereafter are to the record in Docket No. 25177, the case dealing with the Manufacturers and Traders holdup.

photographs supplied by the FBI Redlinski identified Coppola as one of the participants in the robbery. There is no indication that any attempt was then made by the Buffalo police to arrest Coppola. On January 9th Roche personally went to Golombeck's office and informed Golombeck that the FBI possessed information that the three Redlinski suspects intended to rob a tavern in East Buffalo on the following morning (R. 555). Immediately after this interview with Golombeck, Roche contacted John Dwyer, the District Attorney for Erie County, imparted the same information to him, and stated that Dwyer " * * * might take whatever action he desired to protect the citizens of Buffalo and to prevent, if possible, another holdup" (R. 556). Roche at that time also informed Dwyer that Coppola was suspected by the FBI in connection with the Manufacturers and Traders Trust Co. robbery of Feb. 15, 1956 and the later Liberty Bank robbery of October 2, 1956 (R. 556). From Roche's activities on the 9th it is a fair inference that the FBI desired that Coppola be taken into custody for he was an FBI suspect, but that the custody be not a federal one. It is also a fair inference that this desire was so strong that both the Chief of Detectives of the City of Buffalo police and the Erie County District Attorney were independently informed of the impending holdup attempt. Since both Dwyer and Golombeck had been informed that Coppola was a suspect in the Manufacturers and Traders and Liberty Bank holdups, and since Coppola was indeed later interrogated by the FBI after his apprehension, one may conclude that the FBI agent-in-charge informed the state and city authorities at this very time that the FBI desired to interrogate Coppola once he had been taken into custody.

Further, the events occurring on the next day, January 10th, confirm the inference that the FBI's role in Coppola's arrest and detention was a more active role than one would surmise it to have been from the majority opinion. Between 9:30 and 9:45 A.M. Coppola and the two other suspects in the Redlinski robbery were apprehended without warrant while driving in an automobile (R. 505). The apprehending officers were Golombeck and Harry Klenk, head of the homicide squad of the Buffalo Police Department, who seems to have participated in the arrest at Dwyer's instruction (R. 514b, 526). A subordinate police officer happened also to be present in the police vehicle (R. 535). Coppola and his companions were searched, as was their automobile, but nothing incriminating was found either in the car or on their persons (R. 530). The three were taken to Buffalo Police Headquarters, arriving at approximately 11:00 A.M. (R. 509). But shortly *before* they arrived Golombeck telephoned Roche informing him that the arrest had been made (R. 555, 563).[5] Upon arrival at headquarters, contrary to the normal procedure whereby each prisoner upon arrival is taken to the detective bureau on the third floor for "booking," Coppola was taken directly to the cell block on the fourth floor (R. 527-29). The asserted

---

5. I believe that the issue of *when* the apprehending officers telephoned Roche to notify him of Coppola's arrest is of great importance. Surely if the apprehending state officers took the time to telephone the FBI agent-in-charge prior to the time these officers arrived at Police Headquarters, it is erroneous to state, as does the *in banc* majority, "The record shows that the state concentrated on its own business first." Golombeck testified that he did not recall the time of this telephone call (R. 536). On direct examination Roche testified unequivocally to the following:

"Q. What is the next contact you had with the local authorities in regard to this matter? A. On the morning of January 10th at about 11:00 o'clock or shortly thereafter Chief Golombeck called me and told me they had arrested Coppola, D'Antuono and Simmons in the vicinity of the El Chico and that they were then on their way to police headquarters with them." (R. 555.)
Roche repeated this unequivocal testimony on cross examination by Coppola's counsel. (R. 563-64.) I conclude that the telephone call occurred prior to the arrival at police headquarters.

justification for this departure from routine was the presence of newspaper photographers and television cameramen not merely on the first floor where one might reasonably expect them to be, but also upstairs on the third floor, where the detective bureau was located (R. 527–28, 536–37). After receiving Golombeck's call, Roche went to police headquarters, arriving there shortly before noon (R. 564). He was told that Coppola and his two associates had not been interrogated (R. 565). Thereupon Roche left the building to have lunch with Golombeck, Klenk, and Dwyer, their luncheon lasting until approximately 2:30 P.M. (R. 565). With Roche remaining at police headquarters (R. 565), Klenk interrogated Coppola for approximately one hour (R. 519–20). In the course of this interrogation Klenk obtained verbal permission to search Coppola's home. At approximately 3:30 P.M. Dwyer and Roche commenced a joint interrogation of Coppola. After Dwyer questioned Coppola concerning the Redlinski robbery, Roche asked some questions concerning the Manufacturers and Traders robbery and then sought to obtain written permission to search Coppola's home (R. 557–58). Permission was refused, and the interrogation ended soon afterward. It was only thereafter, at approximately 3:45, that Coppola was taken down to the third floor to be booked (R. 518). And it was not until the morning of January 11 after Coppola had confessed during the night-time to the FBI agents that it officially appeared that Coppola was held by the City Police on something other than "suspicion."

From the facts recited above, I am left with the distinct impression that even as Roche was unwilling to leave the question of Coppola's arrest to the sole discretion of the Buffalo Chief of Detectives, so too he was unwilling to trust that officer to determine the course of Coppola's detention and interrogation after the arrest. I suggest that the arresting officers were instructed not to commence questioning Coppola or even to book him until after the FBI's desires could be ascertained. I suggest further that the course of the afternoon's interrogation was determined at the meeting of Golombeck, Klenk, Dwyer and Roche at lunch, and that Roche had an important part in decisions there reached.

Thus I conclude that the FBI had a far greater role in Coppola's arrest and detention than the majority of this court is willing to state; and that the apprehension of Coppola without warrant in the morning and his detention without being booked until it was too late to arraign him that day, a conceded violation of New York State law, both demonstrate that the Federal and State officers worked out an arrangement between them so that the protection accorded federal suspects under McNabb v. United States, supra, could be circumvented.

Lastly, the majority would make much of the statement of Coppola's counsel made before the judge in one but not in both of the cases which they would construe as a concession against the interest of Coppola: "I do not claim that the Buffalo police made an arrest at the behest of the FBI." The statement is taken out of context and was made in the heat of trial, but even standing alone it is valueless as a concession. The word "behest" is synonymous with *order* or *command* or *mandate,* and hence this purported concession still leaves untouched appellant's contention that his state apprehension and subsequent detention were at the *suggestion* and *request* of a federal officer.

I would reverse the convictions below and remand the cases for new trials.