UNITED STATES of America

v.

Amos James SINGLETON, Jr.

Crim. No. 73–111.

United States District Court,
E. D. Pennsylvania.

July 6, 1973.

Robert E. J. Curran, U. S. Atty., E. D. Pa., by John T. Thorn, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Richard A. McDaniel, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

On February 23, 1973, the Grand Jury charged that the defendant Amos Singleton, Jr. robbed a branch of the Girard Bank on or about January 29, 1973, in violation of 18 U.S.C. § 2113(a) and (b). The defendant has moved to suppress all physical evidence seized, oral and written statements admitting the bank robbery in question, and identification testimony. Five grounds are offered in support of the motion to suppress: (1) defendant was arrested without probable cause and his confessions were the fruit of the unlawful arrest; (2) the physical evidence seized was the product of an unlawful search; (3) the oral and written confessions were obtained in violation of defendant's rights under the fifth, sixth, and fourteenth amendments; (4) the oral and written confessions were obtained in violation of defendant's rights under Rule 5(a), Fed.R.Crim.P., 18 U.S.C. § 5035, Rule 116 of the Pennsylvania Rules of Criminal Procedure, 19 P.S.Appendix, and 11 P.S. § 50–310; (5) the anticipated identification testimony is the product of tainted pretrial confrontations.

On the morning of February 7, 1973, Detective Riehl of the Philadelphia Police Department obtained a State arrest warrant charging the defendant, Amos Singleton, with bank robbery, and a State search warrant commanding that Detective Riehl search Singleton's residence at 2767 North 23rd Street, Philadelphia, Pa., for a man's tan overcoat, a pair of men's brown and white checked pants and $4,800 in United States currency. Detective Riehl testified that at approximately 3:30 a. m. on the morning of February 7, 1973, he, in company with other Philadelphia police officers, arrived at the defendant's house and knocked on the front door. He stated that he observed a young negro male lying on the couch in the living room. Before answering the door this man appeared to throw something beneath the couch. Detective Riehl asked the negro male if he was Amos Singleton, whereupon the man said "no". However, Riehl indicated he knew, from having viewed police photographs, that the person he was speaking to was the defendant, Amos Singleton. Detective Riehl gave the defendant a copy of the search warrant, and he and other officers began to search the upstairs bedrooms, looking for the items of evidence described on the face of the search warrant. Detective Riehl stated that while he was upstairs he was informed that Detective Filler, who was watching the defendant, had recovered a loaded .38 caliber revolver from under a cushion of the couch. He then returned downstairs and proceeded to search the living room and dining room. Remembering the defendant's earlier gesture, he looked be-

neath the couch and recovered a Pennsylvania Junior Driver's Permit and a temporary Pennsylvania registration, made out to Amos Singleton and dated January 30, 1973, for a 1971 Ford Thunderbird automobile. The search continued to the basement of the house, where Detective Riehl recovered from a trunk in the rear of the basement a man's tan overcoat and a pair of plaid checked pants. Riehl formally advised the defendant that he was under arrest and departed with the defendant for the Northwest Detective Division at 4:15 a. m. Upon arrival at 4:45 a. m., defendant was placed in a detention room and an official police chronology form was prepared. Detective Riehl testified that he advised the defendant of the nature of the charges against him and warned the defendant of his rights and questioned him as to his understanding of his rights as they appear on the standard police warning card. In response to Riehl's question "Do you want to remain silent", the defendant answered "no" and further stated that he would answer any questions but would not sign anything. Riehl stated that upon being shown a copy of a bank surveillance photograph of the robber, Singleton stated "yeah, that's me." Riehl then terminated the interview at 5:15 a. m. to advise his supervisor, Sergeant Hill, of the defendant's oral admission. Sergeant Hill then commenced questioning the defendant. In concluding his testimony, Detective Riehl stated that at no time during his contact with the defendant was Singleton mistreated or physically abused, nor did the defendant, at any time prior to his attorney's arrival, complain of being in pain or request medical treatment.

Detective John Filler testified that he accompanied Detective Riehl during the search and arrest of the defendant. He stated that he remained on the first floor with Singleton during the search by the other police officers. During this time he observed the defendant place his hand down between cushions on the couch, whereupon he ordered Singleton to stand away from the couch. From beneath the seat cushion, Detective Filler recovered a .38 caliber revolver, loaded with a single round of ammunition. Detective Filler also testified that he made the initial four entries on the chronology form documenting action taken by Detective Riehl and Sergeant Hill up to 5:45 a. m.

Sergeant Hill testified that he saw the defendant being brought into the Northwest Detective Division at approximately 4:45 a. m. He commenced questioning the defendant at 5:15 a. m., after being advised by Detective Riehl of Singleton's oral admission. Sergeant Hill stated that he initially warned Singleton of his rights and questioned the defendant as to his understanding of his rights. He testified that Exhibit G–7 was the actual warning card used by him and he recorded Singleton's answers on this card. Sergeant Hill stated that Singleton orally admitted to perpetrating the bank robbery and utilizing the proceeds to purchase a Ford Thunderbird, but the defendant refused to sign a written statement. Singleton was left alone in a detention room from 6:30 a. m. until approximately 9:15 a. m. when F.B.I. agents arrived. Hill further testified that at no time was Singleton beaten or mistreated following his arrest, but, at the request of defense counsel, he directed that the defendant be taken to a hospital.

Sergeant Marlin Weaver testified that he arrived on duty at 10:35 a. m. on February 7, 1973, and he recalled coming in at the same time as the defense counsel and Mrs. Singleton.

Special Agent Larry Doss testified that he was the primary F.B.I. case agent assigned to investigate the robbery in question. He was advised of Singleton's arrest upon arriving at the F.B.I. office on February 7, 1973, and, together with Agent Robert Bazin, proceeded to the Northwest Detective Division. After conferring with Sergeant Hill and Detective Riehl they commenced interviewing the defendant at 9:50 a. m. Singleton was warned of his constitu-

tional rights and subsequently signed an F.B.I. warning and waiver form. Agent Doss stated that the defendant thereafter orally related the details of his involvement in the robbery while Agent Doss simultaneously reduced Singleton's statements to writing. During the course of this narration, Singleton identified himself as the robber in the bank surveillance photograph and signed the back of this picture. The defendant then reviewed the written statement and signed it at 10:35 a. m. Agent Doss testified that shortly after Singleton signed the statement defense counsel entered the room and demanded to speak to the defendant alone. Agent Doss also offered testimony relating to the pretrial identification occurrences. The first of these took place during the course of his interview at the Girard Bank on February 1, 1973, with the victim teller, Eugenia Sutton. He stated that he showed her a photo-spread comprised of seven photographs of bank robbery suspects (Exhibit G–11), and that Miss Sutton selected a photograph. The second occurrence took place on February 20, 1973 when Agent Doss and the bank witnesses were subpoenaed by the State to appear for a local hearing at 1801 Vine Street. Bank witnesses Eugenia Sutton and David Watson had an inadvertent confrontation with the defendant when he was brought before the Juvenile Court Judge for a brief period. Following this five minute confrontation with Singleton, Agent Doss interviewed the two witnesses separately.

Agent Austin Hamilton testified that during his interview of Assistant Manager David Watson at the Girard Bank on the day of the robbery, he showed Watson a photo-spread comprised of seven photographs of bank robbery suspects (Exhibit G–13). Agent Hamilton described the manner in which this photo-identification was conducted, and he stated that Mr. Watson selected a photograph.

Mr. David Watson, who on January 29, 1973 was the Assistant Manager of the Girard Bank branch office involved in the robbery, described his recollection of the entire robbery. He indicated he was standing near the victim teller approximately five feet away from the bank robber and observed the robber for about 15 seconds. Mr. Watson gave a physical description of the bank robber including a description of his clothing. He also recalled being interviewed by the F.B.I. on the day of the robbery, and viewing a photo-spread (Exhibit G–13). He recalled selecting a picture from a group of photographs shown to him by Agent Hamilton on the day of the robbery and pointed it out to the Court. Mr. Watson described the procedure he used in selecting the photograph on January 29, 1973 as a "process of elimination" involving his mental recollection of the physical features of the bank robber. At the hearing Mr. Watson positively identified the defendant as being the man who robbed the bank. He further testified to two previous Court appearances on the State charges at 1801 Vine Street. He indicated that on February 20, 1973 he was subpoenaed by the District Attorney's Office to appear as a witness, however, the matter was continued. On this occasion Watson recalled that the defendant was brought into the Courtroom for a brief period of time, and stood approximately 15 feet away from him. Watson recalled being interviewed afterward by Agent Doss of the F.B.I. and stating to Agent Doss that the defendant was definitely the bank robber. He also testified that this determination was made by him based upon his recollection of the physical features of the bank robber during the holdup, which had occurred less than one month before.

The eighth and final Government witness was the victim teller, Eugenia Sutton. She testified concerning her recollection of the bank robbery, and indicated that the robber wore no mask and stood directly at her teller's window, less than two feet away from her. Miss Sutton stated that she was able to view the face of the bank robber for about 20

seconds and she gave a physical description of the man and his clothing. She remembered being interviewed by Agent Doss of the F.B.I. on February 1, 1973, and selecting a picture from a photospread (Exhibit G–11), but she could not recall which of the seven photographs she had selected. At the hearing, she positively identified the defendant as the man who robbed the bank. Miss Sutton also testified that she had been subpoenaed to appear at 1801 Vine Street on four separate occasions, only two of which resulted in actual Court appearances. She remembered being in Juvenile Court on February 20, 1973, however, the hearing was continued. The defendant was brought before the Judge, and she saw him briefly from a distance of about fifteen feet. Miss Sutton recalled being interviewed alone by Agent Doss afterward, and she told him she was certain that the defendant was the individual who had robbed the bank. Finally, she testified that she had made this judgment based upon her recollection of the physical features of the bank robber during the course of the holdup.

Mrs. Singleton, the defendant's mother, was the first witness called by the defense. She testified that she was upstairs when the police came and that their search lasted about 45 minutes. She stated that an F.B.I. agent gave her a copy of the search warrant. She also stated that she informed the police her son was a minor. She further testified that she went to defense counsel's office at around 8:45 a. m. on the morning of February 7, 1973 and while there heard him call the police and instruct them not to question her son anymore. She stated that she did not see her son until about 11:45 that morning and that she then noticed bruises on his ear and shoulder.

Doctor Jen Yu testified that he examined the defendant in the screening area of the Philadelphia General Hospital and gave Singleton an appointment to return. He explained that the function of the screening area is to determine whether or not a patient needs emergency treatment. If the patient does not need emergency treatment he is given a future appointment. The doctor's screening examination of Singleton produced no evidence that defendant had been beaten.

The defendant testified that when the police arrived, Detective Riehl gave him a piece of paper and said it was a search warrant. He further testified that he was told he was being questioned about a bank robbery, but he stated that he only gave the statement to the Philadelphia police after he was kicked, and he testified that he did not want to sign the statement he gave to the F.B.I.

 Defendant's initial argument is that neither the State search warrant nor the State arrest warrant issued upon probable cause. The search warrant (Exhibit G–3), on its face, sets forth facts and circumstances sufficient to warrant a prudent man in believing that the defendant committed the bank robbery in question and that the defendant and specified evidence of the crime could be found at the address stated in the warrant. While it is questionable whether the facts and circumstances set forth in the arrest warrant support a finding of probable cause because of the omission in this warrant of the underlying circumstances showing that Amos Singleton committed the crime, it is clear from the detailed showing in the search warrant that the arresting officer had probable cause to arrest the defendant. Thus, even assuming the State arrest warrant was invalid, it will not vitiate the arrest made under the present circumstances. See, United States ex rel. Gockley v. Myers, 450 F.2d 232, 234 (3d Cir. 1971) ; Ray v. United States, 412 F.2d 1052 (9th Cir. 1969). As noted in the earlier recital of testimony presented at the hearing, in addition to objects described in the warrant, the police also recovered a .38 caliber revolver, a learner's permit and a temporary automobile registration certificate. Consideration of the defendant's motion to suppress the revolver is unnecessary

as the Government has stipulated that it will not be introduced as evidence in this case. The learner's permit and temporary registration certificate will not be suppressed. Under the circumstances of this case the Court finds that they were inadvertently discovered during the course of a lawful search of the defendant's premises for the items specified in the warrant. *See,* Coolidge v. New Hampshire, 403 U.S. 443, 464–471, 91 S. Ct. 2022, 2037–2041, 29 L.Ed.2d 564 (1971); Warden v. Hayden, 387 U.S. 294, 299–300, 87 S.Ct. 1642, 1646–1647, 18 L.Ed.2d 782 (1967). Defendant also contends that the learner's permit and temporary registration certificate are inadmissible because they are not listed in the "result of search" section of the warrant. As there has been no showing of prejudice, this contention will be rejected. *See,* United States v. Kennedy, 457 F.2d 63 (10th Cir. 1972); United States v. Moore, 452 F.2d 569 (6th Cir. 1971).

■ The defendant, citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Escobedo v. Illinois, 387 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), next argues that his confessions to the Philadelphia police and the F.B.I. were obtained in violation of his constitutional rights. In the Court's view, however, the totality of circumstances in this case clearly indicates that the defendant knowingly and intelligently waived his rights against self-incrimination and to counsel. Although the defendant was a 17 year old juvenile at the time of his confessions, his age is only one of several factors taken into consideration. *See,* United States ex rel. Brown v. Rundle, 450 F.2d 517 (3d Cir. 1971); West v. United States, 399 F.2d 467 (5th Cir. 1968). Defendant was fully warned of his rights before giving each inculpatory statement. His initial statement to the Philadelphia police was made one-half hour after his arrival at 4:45 a. m. at the Northwest Detective Division. He made a subsequent statement before 6:30 a. m. and was not questioned fur-

ther until agents of the F.B.I. interrogated him at approximately 9:50 a. m. Their interrogation ended at approximately 10:30 a. m. From the evidence presented at the hearing, it is clear that the defendant's confessions were not induced by threats or physical coercion, and that the defendant made no request to see anyone prior to providing the inculpatory statements. The defendant, in the present action, was less likely to be overpowered by the atmosphere of police questioning because, as the extract of his criminal record indicates, he has had prior contacts with the police. *See* generally, United States v. Speaks, 453 F.2d 966 (1st Cir. 1972), cert. denied, 405 U. S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804; United States v. Glasgow, 451 F.2d 557 (9th Cir. 1971).

■■ The defendant's fourth argument is that his confessions to the Philadelphia police and the F.B.I. are inadmissible because they were obtained during a period of unlawful detention in violation of his rights under Rule 5(a), Fed.R.Crim.P., the Federal Juvenile Delinquency Act, Rule 116 of the Pennsylvania Rules of Criminal Procedure and the Pennsylvania Juvenile Act of 1972. As discussed earlier, the defendant was arrested by state authorities during the course of a state investigation of the bank robbery in question. It was normal police procedure for the Philadelphia police to notify the F.B.I. of the defendant's apprehension. Subsequent to questioning the defendant in state custody, the F.B.I. requested of the United States Attorney's Office that authorization be sought to bring federal criminal charges against the defendant and to proceed against him as an adult. On February 21, 1973 authorization was received, and on February 23, 1973, the federal Grand Jury returned an indictment. On the same date a federal bench warrant was issued and lodged as a detainer with the Philadelphia Police Department. At present the defendant continues to be held in State custody on State charges. Defendant states that he was not sent to the Youth Study Center

of the Juvenile Court of Pennsylvania until 7:40 p. m. on the day of his arrest, and he cites Commonwealth v. Tingle, 451 Pa. 241, 301 A.2d 701 (1973), and Commonwealth v. Futch, 447 Pa. 389, 290 A.2d 417 (1972) in support of his argument that his confessions should be suppressed. It is doubtful that the defendant's confessions to the Philadelphia police would be excluded under the State law enunciated in these cases because the delay did not contribute to securing the inculpatory evidence. At any rate, voluntary confessions obtained during a period of illegal state detention are admissible in a federal trial absent proof that such detention for a period forbidden to federal officers was the product of a "working arrangement" between federal and state authorities. *See*, United States v. Davis, 459 F.2d 167 (6th Cir. 1972); United States v. Jackson, 448 F.2d 539 (5th Cir. 1971); United States v. Halbert, 436 F.2d 1226 (9th Cir. 1970); Grooms v. United States, 429 F.2d 839 (8th Cir. 1970); Kulyk v. United States, 414 F.2d 139 (5th Cir. 1969); United States v. Coppola, 281 F. 2d 340 (2nd Cir. 1959); Brown v. United States, 228 F.2d 286 (5th Cir. 1955). The Court in United States v. Coppola, supra, stated:

> "The rule [Rule 5(a), Fed.R.Crim.P.] excludes confessions when the 'working arrangement' includes the illegal detention—in other words, when federal law enforcement officers induce state officers to hold the defendant illegally so that they may secure a confession. However, to bring a case within this rule there must be facts, as there were in *Anderson* [v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829], not mere suspicion or conjecture. Here, as in United States v. Abel, 2 Cir. 1958, 258 F.2d 485, 494, affirmed, 1960, 362 U.S. 217, 226–230, 80 S.Ct. 683, 4 L.Ed.2d 668, rehearing denied, 1960 [362 U.S. 984], 80 S.Ct. 1056 [4 L.Ed.2d 1019], there is no basis on which this court can properly reverse the conclusion of the district judge. The Supreme Court's decision in that case makes plain that the mere fact that two or more agencies have the same crime or the same suspects on their books and that they are cooperating to achieve a solution does not make one the agent of the other and thus responsible for the other's acts. . . . In the absence of any evidence of collaboration to achieve an unlawful end, we would not be warranted in creating a rule whereby prior cooperation of state and federal officials in the investigation of crime would prohibit the admission of uncoerced confessions made during a detention by state officers which the Federal officials did not induce and were powerless to prevent." (281 F. 2d 344, 345)

While the defendant has argued that the F.B.I. and the Philadelphia police were "so entwined and enmeshed that the act of one is the act of the other," a factual basis to support such an allegation has not been presented. Having concluded that there was no "working arrangement" between federal and state authorities, the Court does not reach the question of whether the defendant's confessions were obtained during a period of detention forbidden to federal officers under Rule 5(a), Fed.R.Crim.P., 18 U.S.C. § 5035 and 18 U.S.C. § 3501(c).

■ Finally, the defendant argues that the anticipated identification testimony of eyewitnesses David Watson and Eugenia Sutton should be suppressed as the product of pretrial identification procedures violative of defendant's constitutional rights. Defendant, citing United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970); Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969), and Rivers v. United States, 400 F.2d 935 (5th Cir. 1968), contends that the photo-identification procedures employed here and the identification at juvenile proceedings in State Court on February 20, 1973, were violative of defendant's right to counsel. The Supreme Court in Kirby v. Illinois, 406 U.

S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), however, refused to extend the right to counsel to identifications taking place prior to the initiation of formal criminal proceedings. In United States ex rel. Reed v. Anderson, 461 F.2d 739 (3d Cir. 1972), the Third Circuit overruled its previous requirement enunciated in United States v. Zeiler, supra, cited by defendant, that counsel be present at photo-identifications. In addition, defendant's right to counsel does not extend to an unplanned spontaneous confrontation as in the present case. *See,* United States v. Furtney, 454 F.2d 1 (3d Cir. 1972); United States v. Jackson, 448 F.2d 963 (9th Cir. 1971). No evidence was introduced at the suppression hearing from which the Court could conclude that the confrontation in the absence of counsel at the State Court juvenile proceedings was intentionally arranged by the government. The defendant, citing Stovall v. Denno, 338 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), also contends that the pretrial identification procedures employed in the present case were "unnecessarily suggestive and conducive to irreparable mistaken identification". While the defendant concludes that "the constant viewing of photographs" was one aspect of the alleged suggestiveness, he has presented no evidence of suggestiveness, and the Court concludes that the photo-identification procedures employed in the instant case were not impermissibly suggestive. The spontaneous confrontation during the juvenile proceedings in State Court, while inherently suggestive, was not "so unnecessarily suggestive and conducive to irreparable mistaken identification" that future in-court identifications by those present at it will deprive the defendant of due process of law. *Stovall,* supra, states that a claimed violation of due process depends on the "totality of the circumstances" surrounding the confrontation at issue, and *Stovall* further indicates that relevant considerations include the reasons why the particular confrontations occurred. In the present case, the inadvertent nature of the identification is persuasive that it was not unnecessarily suggestive. *See,* Griff v. Fitzharris, 451 F.2d 151 (9th Cir. 1971); United States v. Jackson, 448 F.2d 963 (9th Cir. 1971). Even assuming that this confrontation was impermissibly suggestive, it is apparent from the earlier recital of testimony received at the suppression hearing that there is an independent basis for an in-court identification by David Watson and Eugenia Sutton. See, United States ex rel. Choice v. Brierly, 460 F.2d 68 (3d Cir. 1972); United States v. Zeiler, 447 F.2d 993 (3d Cir. 1971).

For the foregoing reasons defendant's motion to suppress evidence will be denied.