John E. BURKE, Defendant, Appellant,

v.

UNITED STATES of America,
Appellee.

Leo C. BURKE, Defendant, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 6194, 6195.

United States Court of Appeals
First Circuit.

Feb. 27, 1964.

Walter J. Hurley, Boston, Mass., for appellants.

Stanislaw R. J. Suchecki, Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

These are appeals from two judgments entered on July 8, 1963 by the United States District Court for the District of Massachusetts, following a jury trial, convicting the defendants-appellants, John E. Burke and Leo C. Burke, of mail robbery and conspiracy to rob the mails. The two appeals challenge the trial court's denial of timely motions made by both defendants to suppress as evidence a mail carrier's uniform, two .45 calibre bullets and a twenty dollar bill which were alleged to have been seized from defendants in violation of the Fourth and Fifth Amendments.

The facts as substantially found by the trial court and evidenced by the record are as follows. On December 26, 1962 Post Office Inspector Thomas E. Agnew, one of the inspectors assigned to investigate a mail robbery which had occurred in Dorchester, Massachusetts, on December 20, 1962, considered the defendant John E. Burke a suspect in the case and was engaged in investigating his background. Inspector Agnew was then in possession of information that John Burke had worked in the Fields Corner Post Office from February to March, 1962, that he was transferred to the Roxbury Post Office in March, and that he quit his Post Office job in July, 1962 for no good reason. Inspector Agnew knew that John Burke had done some letter-carrying, that he had formerly owned a mail carrier's uniform and that he had recently obtained a carrier's uniform. He also knew that John Burke met the description of one of the hold-up men given by the driver of the mail truck involved in the Dorchester robbery. There is no evidence in the record indicating that on December 26 or 27 Leo Burke was considered a suspect or was under investigation for the mail truck robbery by any federal law enforcement official.

On December 26, 1962, Inspector Agnew, who wanted to find John Burke and question him about the mail robbery, was searching the Dorchester area for him. He was assisted in his search by three Boston police officers who knew and could identify John if found. About 11:00 p. m. the police officers and Inspectors Agnew and Kelly went to John Burke's home at 99 Harvard Street, Dorchester. The policemen spoke to his wife who told them John was not there. The officers then proceeded to 174 Harvard Street where John Burke also maintained a room. This room was sometimes used by his brother, Leo Burke. Finding neither John nor Leo in the room at 174 Harvard Street, it was agreed that there was no need of the Post Office Inspectors "hanging around any later," since the police

officers' shift required them to work until 3:00 a. m., and that the inspectors would go home and the police officers would notify Inspector Agnew if they found John prior to 3:00 a. m. when they went off duty. At 2:30 a. m., December 27, the police officers returned to 174 Harvard Street. In response to persistent ringing of the doorbell, the landlady opened the door, advised the officers that John Burke was not in, and offered to let the officers inspect his room. They looked around the room, under the bed and in the closet for John Burke, did not find him, observed a postal uniform jacket, and left. Nothing was seized at this time. The police officers did not have a search warrant nor did they then have probable cause as to either Burke.

As the officers were leaving 174 Harvard Street about 2:40 a. m., they observed a young man start to turn in the front walk who stopped when he saw the officers, made a half left turn and continued down Harvard Street. They apprehended the young man, who was under the influence of liquor, and he proved to be Leo Burke. He was arrested, taken in a cruiser to Police Headquarters, booked, searched, and sent to Boston City Jail. The search disclosed that he had in his pockets a wallet containing $118.00 and two bottles of pills.

After arrival at the police station, Detective Cunningham telephoned Inspector Agnew at about 3:20 a. m. and told him that the brother of John Burke had been picked up, that he had $118.77 on his person, that he had been drinking quite heavily and that there was no point in Inspector Agnew coming to the police station seeking to question Leo because he was then under the influence of liquor. At about 9:30 a. m. December 27, Inspectors Agnew and John J. Sullivan questioned Leo Burke at Boston Police Headquarters and prior to questioning Leo, Inspector Agnew fully and fairly advised him of his constitutional rights, including specific advice to the effect that the inspectors were investigating the Dorchester mail robbery, that Leo had a right not to talk with them, that he had a right not to answer any questions and that he had a right to counsel. Inspector Sullivan then asked Leo if the inspectors could look at what he had in his pockets and Leo brought out a wallet and emptied it. Inspector Agnew told Leo "We are not trying to kid you about this" and that some of the bills taken in the mail robbery were marked. The inspectors, who observed markings on two of the $20 bills that Leo had taken out of his wallet, requested him to swap the two marked bills for two other $20 bills. Inspector Agnew advised Leo that the marked bills could be identified by a Post Office Dispatch Clerk and that if Leo gave the bills to them they would be taken to the Dispatch Clerk for identification. Leo told them that he had received the bills in question from the First National Bank in Codman Square the previous afternoon and voluntarily swapped the two $20 bills.

On January 4, 1963 Inspectors Agnew and Sullivan met John Burke at the Field Cafe on Blue Hill Avenue, Dorchester, where he was seated in a booth with friends. Inspector Agnew, advising him of his rights, asked him if he would talk with them, and he stepped outside and entered an automobile with the inspectors. In the car Inspector Agnew again advised him of his right not to talk with them, of his right not to answer any questions, and of his right to counsel. The inspectors then advised him that they would like to see the carrier uniform. He said that they could and that it was at his home. The three drove to 99 Harvard Street, were led into the front bedroom by John who, after being advised of his right not "to show us this stuff" by Inspector Agnew, produced some articles of uniform including two pair of pants and a jacket. The inspectors requested and were granted permission to examine the pockets of the garments and Inspector Agnew, after advising him of his rights for a fourth time that day, patted the pockets of one of the carrier uniform pants and discovered two .45 calibre automatic live cartridges therein. The inspectors re-

quested and were granted permission by John to take the jacket, pants and cartridges. There was no evidence offered indicating that the jacket observed by the police at 174 Harvard Street at 2:30 a. m. December 27 was the same jacket voluntarily turned over by John Burke on January 4, 1963. Before leaving the premises the inspectors received a written authorization signed by John Burke which reads as follows:

"I, John E. Burke, invited Postal Inspectors Agnew and Sullivan into my apartment, 99 Harvard Street, Dorchester, in order for them to examine my letter carrier uniforms.

"I was advised by the Inspectors before coming to my apartment that I did not have to show them anything or let them in the apartment or even talk to them. They advised me I was a suspect in the robbery of a mail truck which occurred on December 20, 1962.

"I authorized the inspectors to look in my uniform pockets and also advised them they could take these uniforms with them if they wished.

"While looking through the watch pocket of the uniform pants, Inspector Agnew produced two .45 shells.

"I hereby authorize the inspectors to take the trousers and bullets with them. I have placed my initials and today's date in the trousers. I also authorize the inspectors to take my uniform jacket and cap.

"Signed: John E. Burke."

■ The district court found the examination of the room at 174 Harvard Street to be an illegal search, but refused to hold applicable the "fruit of the poison tree" doctrine [1] and suppress the evidence since "Inspector Agnew already knew that John Burke had recently acquired a letter-carrier's uniform" and, therefore, "no new evidence was discovered during this illegal search." We agree that knowledge of information gained from an independent source does not become unusable merely because the same information is subsequently discovered during an illegal search. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); Coplon v. United States, 89 U.S. App.D.C. 103, 191 F.2d 749 (1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952).

The arrest of Leo Burke at 2:40 a. m. on December 27 was found by the trial court to be an illegal arrest, one taking place without a warrant or probable cause. Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). The only explanation given to Leo for his arrest, or to the court for that matter, was contained in the answer to a question from Leo while he was riding to Headquarters with the officers: "What is this concerned with?" Detective Cunningham replied "You are under suspicion of a mail robbery in Dorchester."

■ But not every statement or surrender of property made during an illegal arrest is created inadmissible because of the illegal arrest. "[T]hat fact does not require the rejection of evidence volunteered by [the defendant] for reasons sufficient to himself and made without force or compulsion or promise of reward." Gibson v. United States, 80 U.S. App.D.C. 81, 149 F.2d 381, 384 (1945); United States v. Busby, 126 F.Supp. 845 (D.D.C.1954). The question of whether consent to a search was voluntarily given is one of fact, United States v. MacLeod, 207 F.2d 853 (7th Cir. 1953); United States v. De Vivo, 190 F.Supp. 483 (E.D. N.Y.1961), with the burden resting on the government to affirmatively show that there was no duress or coercion, actual or implied. United States v. Martin, 176 F.Supp. 262 (S.D.N.Y.1959). "The government's burden is greater when consent is claimed to have been given while the defendant is under arrest." United States v. Page, 302 F.2d 81, 84 (9th Cir. 1962).

1. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

■ The district court found "as a fact that Leo Burke was fully advised of his rights by the Post Office Inspectors and that his conversation with them and the swap of the two $20 bills made by him subsequent to the illegal arrest was made deliberately and voluntarily on the basis of an intervening independent act of his own free will, and that they were not made under the compulsion of the illegal arrest."

We cannot say as a matter of law that this finding was erroneous. Davis v. United States, 328 U.S. 582, 593, 66 S. Ct. 1256, 1261, 90 L.Ed. 1453 (1946).

■ The district court further found that Rule 5(a) of the Fed.R.Crim.P. requiring arraignment without unnecessary delay was not violated because of the seven hour interval between Leo's arrest and his questioning by Inspector Agnew. The court refused to read Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) "as requiring arraignment before a Commissioner of a person who is so under the influence of liquor as not to recognize the nature of the proceedings." Why this finding was necessary in view of the fact that the court did not appear to adopt appellants' contention that Leo was arrested by the Boston police solely for the federal authorities is not clear. On the contrary, the record discloses that the only agreement between the federal authorities and the city police was that the Postal Inspectors would be notified if and when *John Burke* was located. There is no evidence that Leo was considered a suspect by the federal agents at the time of his arrest. He was booked on state charges. The informing of Inspector Agnew of Leo's arrest by the Boston police, and Agnew's subsequent visit to Boston Police Headquarters to question Leo did not make Leo a federal prisoner and bring him under the protection of Rule 5(a). Cf. United States v. Coppola, 281 F.2d 340 (2d Cir.1960), aff'd per curiam, 365 U.S. 762, 81 S. Ct. 884, 6 L.Ed.2d 79 (1961).

■ We believe the search of John Burke's room on January 4, 1963, was made with his permission and without coercion on the part of the federal officers. Ruhl v. United States, 148 F. 2d 173 (10th Cir.1945).

Judgment will be entered affirming the judgment of the district court.

ALDRICH, Circuit Judge (dissenting in No. 6195).

I cannot concur in the opinion of the court so far as Leo is concerned[*], for two reasons. In the first place, there was no state insulation. It is true that Leo's arrest was not requested by the government, but at the same time it seems equally clear that the police acted solely in what they believed would be the government's interest. Leo was not arrested for intoxication, but apparently only on a police hunch because he was outside John's rooming house and unhappy to see them. On inquiry he was told that he was "under suspicion of a mail robbery job in Dorchester." He was then booked for "suspicion of felony, to wit, a robbery." The fact that the officer in charge of records could not identify the robbery does not indicate that it was not the postal one expressed orally to Leo. I find no affirmative evidence supporting this court's statement (the district court made no such finding) that he was "booked on state charges." Insofar as such booking would extenuate the actions of the federal officials, I believe it should be the government's burden to establish it. The fact that at some later time Leo was held on state charges, apparently after the lineup, which, again, was not shown to have been before the postal inspector's interview, does not of itself meet the burden.

---

[*] The errors as to Leo do not affect John. The court expressly ruled that the evidence of what Leo said, and the $20 bills themselves, were admitted only as to Leo, and were not to be considered on the conspiracy count. Cf. United States v. Harris, 7 Cir., 1954, 211 F.2d 656; cert. den. 348 U.S. 822, 75 S.Ct. 34, 99 L.Ed. 648. And, in the charge, the court reminded the jury to segregate the evidence that had been separately admitted as to each defendant. I believe this was sufficient.

This matter, therefore, comes down to this. Leo, admittedly, was unlawfully arrested. After denying that he had any appreciable amount of money he was searched, again without probable cause, and the incriminating bills were found on his person. This, incidentally, revealed the falsity of his prior statement about lack of funds. That an inconsistent statement may itself be an improper product of an illegal arrest, see Commonwealth v. Palladino, 1964 Mass. A.S. 175, 195 N.E.2d 769. The district court found that it was proper not to take Leo before a Commissioner at 3:20 a. m. because of his intoxication. It made no finding with respect to why he should not have been taken by 9:30 a. m., and I can think of no good reason. A review of the record dispels any thought that the intoxication continued. Rather, so far as appears, Leo was simply held in detention on suspicion of a federal offense so that he could be interviewed by the postal inspectors. The government could not accept this gift and disclaim the imperfections. The mere fact that it had not requested the arrest does not mean to me that the excessive detention was not under the circumstances a "working arrangement" condemned in this respect in Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L. Ed. 829. The court's citation of United States v. Coppola, 2 Cir., 1960, 281 F. 2d 340, aff'd per curiam 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79, where the defendant was held on bona fide state charges seems inapposite. In my view that Mallory is applicable the defendant's statements and production of the bills during detention cannot be made use of by a finding that they were "voluntary." Upshaw v. United States, 1948, 335 U. S. 410, 69 S.Ct. 170, 93 L.Ed. 100. Among other things, a defendant is entitled to be told by a magistrate, not by a government inspector, what are his rights.

Furthermore, I cannot agree that Leo's action in turning over the bills was "voluntary" in any real sense. Rather, this was fruit of the original illegal search.

It is to be borne in mind that Leo's first position, the one he would have preferred to take, was that he did not have this money. When he was later asked by the government officers "if he would like to empty out his pockets" he knew they then knew what was in them. He may well have thought that the best defense was to attempt to make a clean front. Such "voluntariness" does not mean that his conduct was not the product of the initial improper police action. Indeed, this seems as clear a case for the defendant as Commonwealth v. Spofford, 1962, 343 Mass. 703, 180 N.E.2d 673, where a number of federal decisions are collected. I regard the case in this respect as directly within the purview of Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. This rule, of course, applies, whether the improper police action was federal or state. Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669.

On either of these grounds I believe Leo's motion to suppress should have been granted.