**Kenneth B. MOFFETT, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Director, Division of Corrections, Respondent-Appellee.**

No. 74–2118.

United States Court of Appeals, Fifth Circuit.

April 30, 1975.
Rehearing Denied June 10, 1975.

Robert J. Buonauro, Orlando, Fla., William A. Patterson (Court appointed), St. Petersburg, Fla., for petitioner-appellant.

Guy E. LaBalme, Asst. Atty. Gen., Palm Beach, Fla., William I. Munsey, Jr., Asst. Atty. Gen., Tampa, Fla., for respondent-appellee.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges:

TUTTLE, Circuit Judge:

Kenneth Moffett was convicted by a jury in state court in 1964 for armed robbery and aggravated assault. He was sentenced to a life term. After unsuccessfully pursuing his direct appeal, he brought a petition for federal habeas corpus relief, 28 U.S.C. § 2254. The federal district court denied the petition, and Moffett appeals.

## I. FACTS

The Public Loan Company office in Orlando, Florida was robbed on February 21, 1964. Ten days later, on March 3, the defendant, Kenneth Moffett, was arrested in Jacksonville, Florida on a charge of vagrancy. The arresting officer was one C. L. Cody, a detective sergeant in the Duval County Sheriff's office. Moffett was booked and placed in the Duval County Jail; bond was set at $50,000. The defendant was not brought before a magistrate for three days; when he was arraigned, bond was reduced to $25.

Shortly after he booked Moffett into the Duval County Jail, Sgt. Cody joined by one Sgt. Suber, sought out Mildred (Mickey) Thompson, known to them to be a friend of Moffett. They found her at the Green Derby Restaurant where she was working, and asked her about Moffett's apartment at 1812 Riviera Parkway; Sgt. Cody testified she told him that it was Kenny's apartment, but she agreed to accompany him to the apartment. When they arrived at the

apartment, Mickey opened the door. Sgt. Cody testified that he found within the residence two other young girls, Velveline Addison and Judy Allen Frazier. He testified they identified themselves to him as occupants of the premises, and he then requested their permission to search the apartment.[1] After hearing from Sgt. Cody that Kenny was believed to have participated in certain crimes, and that they were suspected of also being involved in those crimes, the girls agreed to permit the officers to search the apartment.

Sgt. Cody testified at Moffett's trial that he had no independent knowledge as to who had rented the apartment, or who was paying the rent; he testified that he had no information as to how long the three girls had been living at that address, other than because "they had all their clothes in the house" he therefore "figured they had been there long enough to move in."

In the course of his search of the apartment, Sgt. Cody discovered a pair of gloves and a gun later identified as having been used by the robber of the Loan Company office, as well as money bags taken during the robbery. These items were introduced at his trial over defendant's objection.

On March 4, after Moffett had spent the night in the Duval County Jail, Cody and Suber confronted him with the items they had found in his apartment; Moffett testified that at first he refused to admit his involvement in the Loan Company robbery, but that after he was told that the police were investigating the three girls found in his apartment and several other girls of his acquaintance, he agreed to cooperate. He then made the confession which was admitted in trial against him.

From the time he was arrested until he confessed Moffett was not permitted to make a phone call, despite the undisputed fact that he requested several times to use the phone, nor was he given any warnings concerning his rights to remain silent and to consult an attorney. Moffett testified that he asked both Cody and Suber to call an attorney, but had been denied that request; Sgt. Cody and Sgt. Suber testified that they had no memory of such a request.[2] Moffett testified that the superintendent of the jail told him that he wasn't to use the telephone, or receive any visitors; the next morning, when he was taken to the sheriff's office for questioning, he testified he again requested permission to call a lawyer, but he was told he would have the right to use the telephone only after his questioning was completed. He testified he was also told that he could not consult a lawyer. He testified that before he was informed his various friends were under investigation, he had told the police that he did not wish to make a statement.

The federal district court found that the vagrancy arrest was a sham charge,

---

1. Sgt. Cody testified that at that time he was working on information that these girls had "been seen in Moffett's company, had been traveling with him; in fact, their clothes were in the house, in that apartment where he was supposed to be living—I still can't testify to the fact that he was living there. I believe he was; he told me he was."

2. On cross-examination Sgt. Cody testified:
"Q: Did he at any time tell you he wanted to consult with an attorney?
A: I don't remember that he made that statement; I don't remember.
Q: He may have, and you don't remember?
A: I don't remember his making that statement to me; I don't remember his saying: "I want legal counsel."

On redirect the prosecutor asked, without objection:
Q: Well, is it your statement, Sergeant, that he did or did not request the services of an attorney?
A: He did not. I have no memory of it. He did not to me.
Sgt. Suber testified on cross-examination:
Q: Did he mention anything about making a phone call?
A: I don't recall.
Q: Do you recall that he wanted a lawyer?
A: No sir, I don't recall it."
Once again the prosecutor attempted to ask a leading question on redirect to have Sgt. Suber restate his lack of memory in more affirmative terms, but at this point defense counsel objected to the form of the question, and was sustained by the trial court.

and that Sgt. Cody lacked probable cause to make it. The state does not challenge this finding that the arrest was illegal. Sgt. Cody testified that he arrested Moffett because "he had no visible means of support. He wasn't employed at the time," but that "we had reason to believe that the defendant had been engaged in criminal activity in Duval County, through confidential sources—*that was the primary reason.*" [Emphasis added.]

In his habeas petition Moffett challenged both the constitutionality of the search of his apartment, and the use of his confession against him. The habeas trial court found that the search had been conducted following proper consent by co-inhabitants of the apartment, that their consent had not been coerced, and that despite the fact Moffett had been illegally arrested on a sham charge, his subsequent confession was wholly voluntary, and properly introduced against him. We reverse.

## II. THE SEARCH

█ The only evidence in the record as to the authority of the three girls to consent to the warrantless search of Moffett's apartment is the testimony of Sgt. Cody, the officer who arrested Moffett and who then searched his apartment. He testified:

> "Kenny related to me he paid the rent on the apartment; and, however, the white females that were present at the time of the search they stated it was their home, or their dwelling."

He acknowledged on cross-examination that he had no knowledge of the girls' authority or their rights to the premises, save for what they had told him. He had no knowledge as to how long they had been in the apartment or who had rented the apartment; Sgt. Cody admitted he lacked any first-hand information as to the authority of the three girls to consent to a warrantless search of Moffett's apartment. None of the girls testified at trial. "[C]onsent to a search is not to be lightly inferred, but should be

shown by clear and convincing evidence." *Phelper v. Decker,* 401 F.2d 232, 236 (5th Cir. 1968). In our view, the state failed to prove that the warrantless search of Moffett's apartment had been consented to by third parties with sufficient rights to the premises.

█ The rule in this Circuit is that "where two persons have equal rights to the use or occupation of the premises, either may give consent to a search, and the evidence thus disclosed may be used against either." *United States v. Hughes,* 441 F.2d 12, 17 (5th Cir. 1971); *United States v. Thompson,* 421 F.2d 373, 375 (5th Cir. 1970); *Gurleski v. United States,* 405 F.2d 253, 262 (5th Cir. 1968). Nothing in the record in this case establishes that the three girls upon whom Sgt. Cody relied to consent to his search had such "equal rights" to Moffett's apartment as to justify the warrantless search.

The habeas trial court believed that the evidence that Sgt. Cody observed some women's clothing in the apartment proved that the girls were co-inhabitants with rights to the apartment equal to Moffett's. We must disagree. There was no evidence as to what clothing was observed, where it was observed, or to whom it belonged. We do not believe the state can sustain its burden of justifying its warrantless search solely on the basis that some female clothing was observed in Moffett's apartment—and that is the only direct evidence as to the three girls' authority to consent to a search. On the record before us there is simply no evidence sufficient to establish that the warrantless search complied with constitutional standards.

Despite the fact the state did not raise the issue in its brief, at oral argument this Court observed that there may be a procedural bar to raising this substantive question in a collateral proceeding. There is substantial ambiguity in the record as to whether the trial court considered the motion to exclude the evidence which resulted from the search, as

defense counsel had failed to make a motion before trial to suppress the evidence, which was apparently the appropriate procedural technique by which such searches could be challenged.[3] Despite the fact that the judge heard on voir dire the account of the two officers as to how they obtained consent to search the apartment, the state trial court limited the voir dire examination of the defendant to the question of the voluntariness of his confession. Out of the presence of the jury he said:

"As I understand it, the only thing we are concerned with as far as testimony or any evidence is as to the admissibility of the confessions. In other words, I do not understand the law to be that we can now get into a question as to whether or not the testimony presented by the state as to the legality of the search and seizure can be controverted—if you understand my point: in other words, there was no motion to suppress filed in this case, and that would have been the time for the Court to go into the question; the statement still shows it was admissible, and a legal search and seizure—was admissible as a legal search and seizure, but we can't stop the trial to go into the question of whether or not a motion to suppress by the defense is proper. I don't know if you understand me. Call your witness and we will proceed."

On direct appeal the Florida Court of Appeals described this colloquy, and stated that it "appears, therefore that the court overruled the defendant's objections to the admissibility of the evidence seized in the search solely on the ground that the defendant had not moved to suppress prior to trial." Moffett v. State, 179 So.2d 408, 411 (2 D.C.A.1965) and on that basis affirmed what the court understood the ruling of the trial court to have been.

3. This rule was not codified until 1967 when Rule 1.190 Fla.R.Crim.P. was adopted. It provides that a motion to suppress evidence obtained through an unlawful search and seizure "shall be made prior to trial unless opportunity therefor did not exist or the defend-

In 1964 the rule that a motion to suppress prior to trial was essential to dispute the constitutionality of a search was a matter of common law practice, not as yet codified. The leading case was Robertson v. State, 94 Fla. 770, 114 So. 534 (1927) where the Florida Supreme Court discussed the rule, stating that it was "the better and safer practice" to move to suppress in advance of trial yet noted that "such a preliminary motion is not always indispensable." 114 So. at 537. The Florida Court of Appeals decision in Moffett v. State implies that the decision to consider a motion to suppress during trial is a matter of discretion left to the trial court, and based its decision that the trial court had refused to consider the constitutionality of the search on its reading of the record. In reading the same record, the federal district court believed that the state trial court had considered the constitutionality of the search and had implicitly held that the search was constitutional inasmuch as the officers had secured proper consent before they performed it. The federal district court agreed that the search was constitutional.

 Under certain circumstances legitimate state procedural rules can preclude consideration of a federal question on federal habeas review, if the state rule substantially serves a legitimate state interest, Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). We do not feel we confront a Henry v. Mississippi question in this case, however, as in our view the question before us is whether the state trial court in fact imposed a procedural bar to consideration of the search issue during voir dire examination at trial. While the record is not without its ambiguity, in our view both because the state trial judge took

ant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion or an appropriate objection at the trial." This rule was closely styled after present Rule 41(e) F.R.Crim.P.

evidence as to the consent the officers obtained before searching, and because the court stated that "the statement still shows it was admissible, and a legal search and seizure," it appears to us that the state trial court considered the search, and determined that it was constitutional. We thus agree with the federal district court that the matter is not barred from collateral attack due to the failure to comply with state procedural requirements, yet we disagree that the search met proper constitutional standards.[4]

Because the state failed to show that the warrantless search was properly consented to by persons with the requisite authority over the searched premises, the items seized from Moffett's apartment were improperly introduced at his trial and his conviction must accordingly be reversed.

We believe the use of his confession also necessitates reversal.

**4.** The Florida Court of Appeals noted that Robertson v. State, 94 Fla. 770, 114 So. 534 (1927) apparently held that a pretrial motion to suppress is not essential when the illegality "appeared from an admitted or uncontroverted state of fact" thereby raising a question of law. 179 So.2d at 412. In response to the defendant's attempt to invoke this exception the state appellate court held that

"The state's evidence did not disclose a search without warrant of an apartment exclusively controlled by defendant upon the purported authority of persons present merely as casual guests. On the contrary, it indicated that the young women who consented to the search resided in the apartment, sharing its use with defendant under circumstances not disclosed by the record. So far as appears, the consent thus given was based on substantial but undefined possessory rights and interests of the young women in the premises, *not upon any authority from defendant,* express or implied." [Emphasis added.] 179 So.2d at 412–13.

This statement is factually inaccurate. The only evidence in the record as to "possessory rights" are the various hearsay accounts of Sergeants Cody and Suber as to what the three girls and Moffett had said—and these hearsay statements are unanimous that Moffett was the sole lessee of the premises.

## II. THE CONFESSION

Moffett's confession was obtained while he was held in custody following what was found by the federal district court to have been an illegal arrest. The state does not now attempt to defend the original arrest, recognizing as we do that by Sgt. Cody's own admission, his arrest of Moffett for vagrancy was wholly a sham, a pretext by which he intended to pursue his investigation into Moffett's possible connection with recent armed robberies. Admittedly then the officer lacked probable cause to arrest Moffett on the vagrancy charge, and the enormous bond of $50,000 was apparently designed solely to guarantee that the defendant would remain in custody while the investigation proceeded. Moffett challenges the use of the confession he made while he was being illegally detained, arguing that such a statement constitutes "fruit of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[5]

While no substantial evidence whatever exists as to the authority of the three girls to consent to the search, the record shows the undisputed understanding of the searching officers to be that *Moffett* was the apartment's tenant—and there is nothing in the record to indicate that the three girls exercised any authority over the premises *other than that which they derived from the defendant.* Thus if the state appellate court meant to construe *Robertson* to justify the defendant's failure to make a pretrial motion to suppress if the sole basis for the third parties' authority to consent was derived from the defendant, this was in fact the precise situation here. As a factual matter, then, the state court misread the record in such a way as to affect its holding on a possible exception to the common law requirement of a pretrial motion to suppress.

This affords a second reason why no procedural bar exists to limit our consideration of the validity of the search.

**5.** Moffett also argues that his confession was inadmissible because the state failed to comply with the rule of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) in that he was denied the opportunity to consult with an attorney after he requested one, and in the alternative that the confession was not given voluntarily inasmuch as it was induced by the coercion of implicit threats

Prior to *Wong Sun* an illegal arrest did not necessarily taint a subsequent confession unless the arrest and detention were part of a framework of coercion, whether physical or psychological. *See* Smith v. United States, 103 U.S.App.D.C. 48, 254 F.2d 751 (1958) cert. denied 357 U.S. 937, 78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958); United States v. Walker, 176 F.2d 564 (2d Cir. 1949) cert. denied 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949); Brinegar v. United States, 165 F.2d 512 (10th Cir. 1948) aff'd 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948). The Supreme Court in *Wong Sun*, however, held that certain statements made following an illegal arrest were inadmissible, despite the fact that the statements could not have been said to have resulted from coercion. "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable as to be purged of the primary taint.'" 371 U.S. at 488, 83 S.Ct. at 417. Restated in slightly different form, the question is not simply whether the statement can be said to have been voluntary but whether the statement "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U.S. at 486, 83 S.Ct. at 416.

As this Court stated shortly after the Supreme Court's decision in *Wong Sun*, "just as evidence taken during or directly resulting from an illegal arrest is inadmissible under the doctrine of Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, Silver-

thorne Lumber Co. v. United States, [251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319] and Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, so are oral statements by persons arrested . . . which are so inextricably bound up with an illegal arrest so as to become 'tainted'", Rogers v. United States, 330 F.2d 535, 541 (5th Cir. 1964) cert. denied 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964).[6]

This Court has not established a *per se* rule that statements made during a period of illegal detention are necessarily excluded, Phelper v. Decker, 401 F.2d 232, 237, n. 13 (5th Cir. 1968); Rogers v. United States, *supra*.[7] The Supreme Court in *Wong Sun* noted that "we need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police," 371 U.S. at 487–88, 83 S.Ct. at 417, and indeed the Court upheld the use of Wong Sun's statement.

In evaluating the admissibility of statements obtained during a period of illegal detention this Court has looked to many different factors in deciding whether the statement was sufficiently related to the initial illegal arrest as to render it inadmissible. Among these factors are the circumstances surrounding the arrest, Thomas v. United States, 377 F.2d 118, 120 (5th Cir. 1967); cert. denied, 389 U.S. 917, 88 S.Ct. 246, 19 L.Ed.2d 273 (1967); Rogers v. United States, *supra*, 330 F.2d at 542; whether the custody was continuous, Thomas v. United States, *supra*, 377 F.2d at 120; the duration of the custody; United States v. Cox, 459 F.2d 986 (5th Cir.

made by the police against Moffett's friends should he not cooperate. In light of our decision that the confession is inadmissible due to the taint of the prior illegal arrest, we need not reach either of these alternative grounds.

6. Moffett was charged under a vagrancy statute subsequently held to be unconstitutional in Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). The unconstitutionality of the statute does not, however, establish that Moffett's arrest was illegal within the meaning of *Wong Sun*; as we held in United States v. Kilgen, 445

F.2d 287, 289 (5th Cir. 1971) "overturning a conviction due to an invalid statute does not automatically render the previous arrest and detention illegal absent some showing that police officials lacked a good faith belief in the validity of the statute."

7. *But see* Hale v. Henderson, 485 F.2d 266 (6th Cir. 1973) cert. denied 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974) which establishes a very restrictive test as to when statements following an illegal arrest can be used.

1972); Thomas v. United States, *supra*; Rogers v. United States, *supra*; the pattern of interrogation; Phelper v. Decker, *supra*; Thomas v. United States, *supra*; Rogers v. United States, *supra*,[8] and perhaps most importantly whether the suspect had been apprised of his legal rights, and whether he has thus knowingly waived the opportunity to consult with an attorney, or to end the interrogation. United States v. Cox, 459 F.2d 986 (1972);[9] Harney v. United States, 407 F.2d 586 (5th Cir. 1968); Samora v. United States, 406 F.2d 1095 (5th Cir. 1969); Phelper v. Decker, *supra*; Alexander v. United States, 390 F.2d 101 (5th Cir. 1968); Thomas v. United States, *supra*. In short, as we stated in Phelper v. Decker, *supra*, two considerations stand out as most prominent—whether substantial intervening occurrences take place between the time of the illegal arrest and the statements which are sought to be admitted, as for example the opportunity to consult with an attorney, or to terminate interrogation, and secondly, the extent to which the arrest was a "gross violation of legal processes" as opposed to a "failure to comply with technical requirements." 401 F.2d at 237–38. Based on these two factors, we believe Moffett's confession was inextricably tainted by his illegal detention, and that no intervening act of free will could be said to have occurred which would dissipate the taint of the illegal arrest.

The suspects in virtually all our prior cases[10] which upheld the admissibility of their statements despite their prior illegal detention were fully apprised of their rights to counsel, and to end their interrogation without answering any questions. Here, despite the fact that we recognize that Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is inapplicable, because the arrest in question occurred in 1964, Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), we note that Moffett was given no warnings whatever. In addition he was held incommunicado on a $50,000 bond having to wait several days before being brought before a magistrate. Although the facts are disputed as to whether he actually requested to speak to an attorney, it is undisputed that he repeatedly asked to use a telephone but was denied that request both by the arresting officers, the superintendent of the Duval County Jail, and his interrogators. Thus, despite the fact that full *Miranda* warnings are not required as a constitutional prerequisite to admission of the confession,[11] we nonetheless believe that the opportunity to consult with counsel, or at least having been apprised of one's right to do so, is substantial evidence that any subsequent confession is "an act of free will,"

**8.** *See also* Allen v. Cupp, 426 F.2d 756, 759 (9th Cir. 1970); Thompson v. Warden, 413 F.2d 454, 455 (4th Cir. 1969).

**9.** *See also* Allen v. Cupp, *supra*; United States v. Close, 349 F.2d 841 (4th Cir. 1965); Commonwealth of Pennsylvania v. Maroney, 348 F.2d 22 (3d Cir. 1965); Burke v. United States, 328 F.2d 399 (1st Cir. 1964).

**10.** Only in Rogers v. United States, 330 F.2d 535 (5th Cir. 1964) cert. denied 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964) was the defendant not advised of his constitutional rights to consult with counsel or to refuse to answer the questions of his interrogators. In *Rogers*, however, this Court emphasized the total lack of oppressive circumstances surrounding the defendant's arrest, the fact that his interrogation was non-continuous, and the fact that there was a delay between the time of his arrest and his confession. In *Rogers*

we placed primary emphasis upon this later factor, stating that this reliance on a separation in time between arrest and subsequent confession was only a tentative construction of *Wong Sun*; we have subsequently held that time alone is not a sufficient consideration to offset the taint, for to rely solely on a separation in time between arrest and statement would permit the police to maintain a suspect "on ice" for an interminable period, and then be free to use whatever he says. Phelper v. Decker, 401 F.2d at 237.

**11.** We note that on several occasions courts have emphasized the use of discretionary warnings despite the fact the arrest occurred before *Miranda*. *See* Thomas v. United States, 377 F.2d 118, 120 (5th Cir. 1967) cert. denied 389 U.S. 917, 88 S.Ct. 246, 19 L.Ed.2d 273 (1967); Allen v. Cupp, 426 F.2d 756 (9th Cir. 1970); Commonwealth of Pennsylvania v. Maroney, 348 F.2d 22 (3d Cir. 1965); Burke v. United States, 328 F.2d 399 (1st Cir. 1964).

and thus distinct from the prior illegal arrest. *Miranda*, though inapplicable directly, clearly teaches us to view with "judicial skepticism," Alexander v. United States, 390 F.2d 101, 110 (5th Cir. 1968) any claims by police interrogators that a suspect who has not been warned of his rights to remain silent or to consult with an attorney freely, knowingly and deliberately chose to cooperate with his questioners.

In addition, we note that while Moffett's interrogation was not continuous, it was rigorous and intense—and conducted by what the record shows to have been ten different officers; Moffett was immediately confronted on the morning of March 4 with the evidence seized from his apartment, and coupled with this were what Moffett testified he understood to be implied threats against the girls found in his apartment and other girls of his acquaintance. Given these conditions, and the fact that the record shows the object of the illegal detention was to pursue Moffett's questioning without interruption, we believe no intervening circumstances were shown which would have the effect of dissipating the taint of the initial illegal arrest.

In addition, and most importantly, we believe the arrest was the type of "gross violation of legal processes" Phelper v. Decker, 401 F.2d at 238 that justifies exclusion of the confession. Unlike instances where the arrest suffered only from a technical deficiency such as Ralph v. Pepersack, 335 F.2d 128, 136 (4th Cir. 1954), here there was a virtual acknowledgment by the arresting officer that no probable cause existed to believe that Moffett had in fact violated the vagrancy statute; the sole purpose for the arrest was to continue the investigation of Moffett's possible connection with a series of armed robberies. He was booked, held on a huge bond, denied access to a telephone, denied visitors, and was eventually told the next morning that he would be able to make a telephone call only after his questioning

was completed. The record shows this questioning began at 8:00 a. m. on March 4, and was conducted by ten different officers. We can reach no conclusion other than "an object of the illegal conduct" Allen v. Cupp, 426 F.2d 756, 759 (9th Cir. 1970) was the obtaining of Moffett's statement as to his connection with the armed robbery of the loan company office. This is precisely the kind of gross police misconduct the rule of *Wong Sun* was intended to prevent.

In sum, we find the confession secured against Moffett to be illegally tainted by his initial unlawful detention; we find no evidence that an intervening act of free will so dissipated the taint that the confession ultimately obtained cannot be said to have been due to the exploitation of the original illegal detention. Both the circumstances of the arrest, and the pattern of interrogation convince us that *Wong Sun* dictates that the confession be excluded.

Accordingly, we reverse and remand for proceedings not inconsistent with this opinion.